**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 10-1063

DOROTHY JEAN SIMMONS,

*Petitioner-Appellee,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellant,*

*On Appeal from the Decision of the United States Tax Court*

## BRIEF OF APPELLEE

ROBERT J. ONDA
TIMOTHY S. RANKIN
ONDA, LaBUHN, RANKIN & BOGGS
  CO., LPA
266 North 4th Street
Suite 100
Columbus, OH 43215

*Attorneys for Appellants*

November 1, 2010

## CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

A.    *Parties and Amici.*   All parties and amici appearing in this Court are listed in the Brief for Appellant.

B.    *Rulings under Review.*   The following rulings made in the memorandum opinion by Tax Court Judge Robert Goeke, *Simmons v. Commissioner*, T.C. Memo. 2009-208, dated September 15, 2009, are at issue in this Court:

1.    Whether taxpayer's contribution of conservation easements to The L'Enfant Trust, Inc., in 2003 and 2004 with respect to two certified historic structures owned by taxpayer and  located in the Logan Circle Historic District within the District of Columbia were "exclusively for conservation purposes" (Doc. 41 at 11; A. ___); and

2.    Whether the appraisals of the conservation easements obtained by taxpayer to establish the value of the easements were "qualified appraisals".  (Doc. 41 at 17; A. ___).

C.    *Related Cases.*   To the best of their knowledge, counsel for the taxpayer is not aware of any previous or pending related cases in this Court.

## TABLE OF CONTENTS

**Page**

Certificate as to parties, rulings and related cases ................................... i

Table of contents .......................................................................... ii

Table of authorities ...................................................................... vi

Glossary...................................................................................x

Jurisdictional Statement .................................................................1

Statutes and regulations.................................................................3

Statement of facts .......................................................................4

    1.    Taxpayer's properties .........................................................4

    2.    Pre-existing legal restrictions on the use of the properties ..................4

    3.    Taxpayer's grant of easements .................................................6

    4.    Taxpayer's claim of charitable deductions for the grants of the façade easements ...................................................6

    5.    The Tax Court proceedings .....................................................9

    6.    The Tax Court opinion .........................................................10

Summary of argument....................................................................10

Argument..................................................................................15

    The Tax Court properly held that Taxpayer is entitled to charitable contribution deductions for easements granted to L'Enfant because the easements were qualified conservation contributions, and the appraisals obtained by taxpayer to substantiate the values of the charitable contributions were qualified appraisals ........................................15

I.    The Tax Court properly held that the easements were
      "qualified conservation contributions".................................15

      A.    Introduction....................................................................15

      B.    Taxpayer's easements are qualified real property interests........7

      C.    L'Enfant is a qualified organization .........................................17

      D.    Taxpayer's easements are exclusively for conservation
            Purposes ......................................................................18

            1.  Conservation purpose...........................................................18

                a.  Preservation of certified historic structures is a
                    conservation purpose .....................................................18

                b.  A conservation easement may permit the easement holder
                    the right to allow future development without defeating
                    the conservation purpose requirement...........................19

            2.  Exclusively for conservation purposes ...............................24

                a.  The conservation purpose of the easements is protected
                    in perpetuity notwithstanding the rights of L'Enfant to
                    consent to changes or abandon the easement rights.......25

                b.  The conservation purpose is protected in perpetuity
                    notwithstanding the possibility exists that L'Enfant may
                    take actions which are in contravention of its corporate
                    charter and in contravention of the conservation purpose
                    expressed in the easement.............................................31

                c.  The mortgagees of taxpayer's properties properly
                    subordinated their rights in the properties to the rights of
                    L'Enfant to enforce the conservation purposes in
                    perpetuity .....................................................................33

II.   The Tax Court properly held that the taxpayer satisfied the substantiation requirements for contributions of property in excess of $5,000 ................................................................................34

      A.   Introduction ..................................................................34

      B.   Taxpayer's appraisals are qualified appraisals ........................35

           1.  Qualified appraisals defined ..................................35

           2.  Taxpayer's appraisals were timely prepared .....................37

           3.  Taxpayer's appraiser is a qualified appraiser ....................37

           4.  Taxpayer's appraisals include the information required by Treas. Reg. § 1.170A-13(c)(3)(ii).......................................38

                a.   Taxpayer's appraisals provide an adequate description of the property contributed..................................................38

                b.   Taxpayer's appraisals adequately describe the physical condition of the underlying property .............................39

                c.   Taxpayer's appraisals set forth the date of Contribution ..................................................................39

                d.   The terms of any agreement or understanding entered into by or on behalf of the donor or donee that relates to the use, sale or other disposition of the property contributed ..................................................................40

                e.   Taxpayer's appraisals include the name and address of the qualified appraiser and the qualifications of appraiser..................................................................40

                f.   Taxpayer's appraisals include a statement that the appraisals were prepared for income tax purposes.........40

                g.   Taxpayer's appraisals include the date on which the property was appraised ..................................................41

iv

h.  Taxpayer's appraisals include the appraised fair market value of the contribution ..................................................42

i.  Taxpayer's appraisals include the method of valuation used to determine the fair market value and the specific basis of the valuation ......................................................42

j.  Taxpayer's after easement appraisal method.................42

k.  The basis of the valuation, factors and considerations relevant to buyers and sellers of façade easements ........47

III.  The requirements of Treas. Reg. § 1.170A-13(c)(3) may be fulfilled by substantial compliance ..................................................................57

Conclusion...........................................................................................60

Certificate of compliance ........................................................................61

Certificate of service ..............................................................................62

# TABLE OF AUTHORITIES

**Cases:**                                                                   **Page(s)**

*Bond v. Commissioner,*
    100 T.C. 32 (1993)............................................................ 58, 58-59, 59

*Hewitt v. Commissioner,*
    109 T.C. 258 (1997)............................................................ 59-60

*LaRouche's Comm. For a New Bretton Woods v. Fed. Election Comm'n*
    (D.C. Cir. 2006), 439 F.3d 733 ......................................................1

*Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency,*
    489 F.3d 1221 (D.C. Cir. 2007)....................................................57

*Taylor v. Commissioner,*
    67 T.C. 1071 (1977).......................................................... 58, 59

*United States v. Mead Corp.,*
    533 U.S. 218 (2001)..................................................................57

**Statutes:**

Internal Revenue Code (26 U.S.C.)

§ 47(c)(3)(B) ............................................................................26

§ 47(c)(3)(B)(ii) ......................................................................19

*§ 170(f)(3) ..............................................................................20

§ 170(f)(3)(B)(iii) ...................................................................16

§ 170(f)(11) ..........................................................................3, 34

§ 170(h) ....................................................................................20

*Authorities upon which we chiefly rely are marked with asterisks.

§ 170(h)(1)..............................................................................................11

§ 170(h)(1)(A) ................................................................................... 11, 16

§ 170(h)(1)(B) ................................................................................ 11, 16-17

*§ 170(h)(1)(C) .....................................................................................17

§ 170(h)(2)(C) ................................................................................... 11, 17

§ 170(h)(3)............................................................................................17

*§ 170(h)(4)(A) .....................................................................................18

§ 170(h)(4)(A)(iv) ....................................................................... 15, 18, 23

* § 170(h)(4)(B)(ii) .......................................................................... 15-16, 18

*§ 170(h)(5)(A) ............................................................................... 18, 24

American Jobs Creation Act of 2004, Pub. L. 108-357 § 883, 118
Stat. 1631.............................................................................................16

D.C. Code

§ 6-1101..........................................................................................5, 26

§ 6-1102(5) ............................................................................................4

**Rules and Regulations:**

DCMR Title 10A § 308.4.......................................................................21

Fed. Rule App. P. 3(c)..............................................................................1

Fed. Rule App. P. 15(a)............................................................................1

Treasury Regulations (26 C.F.R.)

§ 1.170A-13...........................................................................................3

§ 1.170A-13(c)(2) ........................................................................... 35, 36

*§ 1.170A-13(c)(2)(i).........................................................................10

*§ 1.170A-13(c)(3)(i).................................................................... 35-36

§ 1.170A-13(c)(3)(i)(A)......................................................................37

§ 1.170A-13(c)(3)(i)(B)......................................................................13

*§ 1.170A-13(c)(3)(ii)................................................................. 13, 36-37

§ 1.170A-13(c)(3)(ii)(A).................................................................. 13, 38

§ 1.170A-13(c)(3)(ii)(B).................................................................. 13, 39

§ 1.170A-13(c)(3)(ii)(C).................................................................. 13, 40

§ 1.170A-13(c)(3)(ii)(D).................................................................. 13, 40

§ 1.170A-13(c)(3)(ii)(E).................................................................. 13, 40

§ 1.170A-13(c)(3)(ii)(F).................................................................. 13, 40

§ 1.170A-13(c)(3)(ii)(G)............................................................... 13, 40-41

§ 1.170A-13(c)(3)(ii)(H).................................................................. 13, 41

§ 1.170A-13(c)(3)(ii)(I).................................................................. 13, 42

*§ 1.170A-13(c)(3)(ii)(J) .......................................................... 13, 13-14, 42

*§ 1.170A-13(c)(3)(ii)(K) ........................................................... 13, 14, 42

§ 1.170A-13(c)(5) ........................................................................ 13, 43

§ 1.170A-14(d)(1) ...........................................................................15

§ 1.170A-14(d)(1)(iv) .......................................................................15

§ 1.170A-14(d)(5) ........................................................................... 15, 23

*§ 1.170A-14(d)(5)(i) .................................................15, 18-19, 19, 19-20

§ 1.170A-14(d)(5)(iii) ......................................................................... 15-16

*§ 1.170A-14(g)(1) ...............................................................................31

*§ 1.170A-14(g)(2) ...............................................................................32

*§ 1.170A-14(g)(3) ..................................................................... 12, 32, 33

*§ 1.170A-14(g)(6) ...............................................................................26

§ 1.170A-14(g)(6)(i) .............................................................................26

§ 1.170A-14(h)(3) ....................................................................... 13, 20, 43

§ 1.170A-14(h)(3)(i) .......................................................................... 42-43

§ 1.501(c)(3)-1(a)(1) ...................................................................... 26-27, 27

§ 1.501(c)(3)-1(b)(4) ............................................................................30

§ 1.501(c)(3)-1(c)(1) ............................................................................27

**Miscellaneous:**

26th Annual Report to the Council of the District of
Columbia on the Implementation of the D.C. Historic
Landmark and Historic District Preservation Act of
1978 (May, 2005)................................................................................2, 5

Historic Properties: Preservation and Valuation Process,
Judith Reynolds, 3rd Ed. (Chicago Appraisal Institute 2006) .......................... 46, 55

Historic Properties: Preservation and Valuation Process,
Judith Reynolds, 2nd Ed. (Chicago Appraisal Institute 1997).......................... 55-56

## GLOSSARY

| | |
|---|---|
| HPO | Historic Preservation Office |
| IRS | Internal Revenue Service |
| L'Enfant | The L'Enfant Trust, Inc. |

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

### DOROTHY JEAN SIMMONS,

**Petitioner-Appellee**

**v.**

### COMMISSIONER OF INTERNAL REVENUE,

**Respondent-Appellant**

———————————

### ON APPEAL FROM THE DECISION OF THE
### UNITED STATES TAX COURT

———————————

### BRIEF FOR THE APPELLEE

———————————

### JURISDICTIONAL STATEMENT

Federal Rule of Appellate Procedure 3(c) requires, *inter alia*, that a notice of appeal "designate the judgment, order, or part thereof appealed from."  Federal Rule of Appellate Procedure 15(a), which pertains to appeals taken from administrative decisions, contains a nearly identical provision.  These requirements are mandatory and, importantly, jurisdictional.[1]

---

[1] *LaRouche's Comm. For a New Bretton Woods v. Fed. Election Comm'n* (D.C. Cir. 2006), 439 F.3d 733, 739 ("Rule 15(a)… requires that a petition for review "specify the order or part thereof to be reviewed.")

1

The Commissioner raises two issues on appeal: "Whether the Tax Court erred in holding that: (i) easements donated to L'Enfant Trust… were exclusively for conservation purposes within the meaning of 26 U.S.C. §§ 170(h)(1)(C) and (h)(5); and (ii) the appraisals appellant offered to establish the value of the easements satisfied the requirements of… 26 C.F.R § 1.170A-13(c)(3)(ii)…" (Statement of Issues to be Raised)[2]

The issues raised by Appellant address whether taxpayer's property contribution is properly eligible for a charitable contribution, not the value of the contribution. If the property right donated by taxpayer is a property right for which a charitable contribution deduction is permitted, the value of the right must then be determined.  The Commissioner did not appeal the findings of the Tax Court as to the value of the contribution.  In short, satisfaction of the exclusively for conservation purpose and qualified appraisal requirements does not address the value of the contribution, only that taxpayer is otherwise eligible to claim a charitable deduction.  Thus, if this Court affirms the findings of the Tax Court that the contributions were exclusively for conservation purposes and the appraisals were qualified appraisals, the findings of the Tax Court regarding the value of

---

[2]  Although the Statement of Issues to be Raised identifies the appraisals of Appellant as the appraisals at issue, Appellee believes the Commissioner intended to instead identify Appellee's appraisals.

2

taxpayer's contributions must stand because this issue is not properly before this Court.

## STATUTES AND REGULATIONS

Taxpayer agrees that the pertinent statutory authority includes 26 U.S.C. § 170(a), (f) and (h) and the pertinent regulations include 26 C.F.R. §§ 1.170A-13, and 1.170A-14 ***as in effect*** on the dates taxpayer conveyed her conservation easements to L'Enfant (November 12, 2003 and January 26, 2004) (emphasis added).  26 U.S.C. § 170(f)(11), which defines "qualified appraisal" and "qualified appraiser" and grants to the Secretary of the Treasury the statutory authority to prescribe regulations to carry out the purposes of the section, cited by Appellant in his Brief and replicated in the Appellant's Addendum, was added as part of the American Jobs Creation Act of 2004, Pub. L. 108-357 § 883, 118 State. 1631.  The provision is effective for contributions ***after*** June 3, 2004 (emphasis added) and should not be considered by this Court.

Appellant's Addendum also includes a copy of I.R.C. § 170(h)(4) as in effect today.  I.R.C. § 170(h)(4) was amended as part of the Pension Protection Act of 2006, adding subparagraph (h)(4)(B), effective for contributions made after July 7, 2006 and redesignating subparagraph (h)(4)(B) as (C).

3

## STATEMENT OF FACTS

The Statement of Facts set forth on the Brief for Appellant is supplemented as follows:

### 1.    Taxpayer's properties

The Logan Circle neighborhood is part of a Historical Preservation District (as defined in D.C. Code § 6-1102(5)) and is listed on the National Register of Historical Places (Doc. 36 at 74; A. ___.)  As of the date the conservation easements were conveyed to L'Enfant, both properties were certified by the United States Department of the Interior, National Park Service, as "certified historic structures".  (*Id.* at 16, 19; A. ___; Ex. 9 at 19; A. ___; Ex. 10 at 31; A. ___.)

### 2.    Pre-existing legal restrictions on the use of the properties

The Commissioner adequately summarizes the statutory preservation regime for historic districts in the District of Columbia.  However, the Commissioner fails to address the limitations which impact how the preservation regime is administered on a day to day basis.  Although the HPO has enforcement rights and powers, economic and human resource limitations prevent the HPO from operating a proactive inspection and enforcement program.  (Doc. 41 at 91-92, 94; A. ___.)

For example, the HPO is responsible for regulating approximately 25,000 - 26,000 properties.  (Doc. 36 at 86; A. ___.)  However, the HPO enforcement arm has only two inspectors available to go out and inspect properties.  (Doc. 36 at 77;

4

A. ___.)  Because of the large number of properties and the limited number of inspectors, the HPO inspectors do not have time to do routine inspections of historic districts for compliance purposes.  (*Id.* at 91.)  Instead, the inspections for compliance are merely reactions to complaints received from the public and the HPO has no proactive enforcement program in place.  (*Id.* at 91-92.)

The HPO has the authority to initiate criminal proceedings for failure to comply with the District of Columbia statutes and regulations, however the HPO has never initiated a criminal action.  (*Id.* at 92.)  Finally, although the HPO is conducting approximately 1,000 inspections per year in response to complaints, only 10-15% result in violation notices and 20-25% in stop work orders.  (*Id.* at 80.)  In fact, during the fiscal year of October 1, 2003 to September 30, 2004, the HPO collected only $1,880 in fines from enforcement actions.[3]

With regard to conservation easements, if the easement holder no longer exists, by law the responsibility for enforcing the easements reverts to the HPO.  (*Id.* at 94.)  The HPO prefers not to hold private conservation easements because the HPO is not administratively set up to do so.  (*Id.* at 94.)  Because of the limited

_____

[3] The Historic Landmark and Historic Preservation Act of 1978, D.C. § 6-1101, *eq. seq.*, requires that, by April 1 of each year, the Mayor transmit to the Council a detailed report on the implementation of the Act.  D.C. Official Code, Section 6-1113.  The 26th Annual Report to the Council of the District of Columbia on the Implementation of the D.C. Historic Landmark and Historic District Protection Act of 1978 (May 2005) reports the revenue collected from enforcement activities during the April 1, 2003-September 30, 2004 fiscal year, page 14.

number of resources, it is difficult for the HPO to annually monitor easements. (*Id.* at 95.) Accordingly, as a policy matter, the HPO works with other easement holding organizations, including L 'Enfant, to have such easements reassigned to them. (*Id.* at 94.)

**3.    Taxpayer's grants of easements**

The mortgage holders for each property joined in the execution of the deeds, and are parties to the deeds. Article IV, Paragraph D of each deed provides in pertinent part, "[l]enders hereby subordinate their rights in the Property to the right of [L'Enfant], its successors or assigns, to enforce the conservation purposes of this easement in perpetuity, *and join in the execution of this Conservation Deed for the sole and limited purpose of so subordinating their interest*." (emphasis added.) (Ex. 7 at 4; A.__; Ex. 8 at 4; A. ___.)

**4.    Taxpayer's claim of charitable deductions for the grants of the façade easements**

Each appraisal prepared by taxpayer's appraiser, James Donnelly, consists of the following components:

(a)    Transmittal letter, dated as of the date of the contribution, stating the before value of the property and the loss in value to the property as a result of being encumbered with the easement;

(b)    Photographs of the subject property;

(c)    A summary of the salient facts and conditions;

6

(d)    The before value analysis;

(e)    The after value analysis;

(f)    A completed Form 8283;

(g)    Exhibits, including the qualifications of the appraisers, the form Conservation Easement Deed of Gift, and information in the public domain regarding preservation easements ;

(h)    The scope of the appraisal; and

(i)    Limiting conditions.

(Ex. 9; A.___; Ex. 10; A. ___.)

In determining the after easement values of the properties, Donnelly applied a market methodology, which took into consideration and quantified the factors a competent buyer would take into account in acquiring a property encumbered with a L'Enfant easement.  (*Id*.)  These factors, which were addressed during the Tax Court proceedings, included:

i.    The more onerous burdens imposed on owners of L'Enfant easement properties versus owners of  properties subject only to local law (*Id*. at 19; *Id*. at 31);

ii.    The enhanced easement inspection and enforcement activities of L'Enfant, versus the HPO (*Id*. at 20; *Id*. at 32);

iii.     The increased expenses a L'Enfant easement property owner may incur versus a non-easement property owner, resulting from having to seek approval of changes from L'Enfant for alterations which the HPO may or may not govern, enhanced repair and maintenance guidelines versus local law and correcting non complying actions (which include being responsible for the payment of legal fees incurred by L'Enfant to enforce its easement rights) versus correcting HPO non-complying actions (*Id.*);

iv.     The examination of numerous encumbered property sales within the population of 420 easement encumbered District of Columbia properties (*Id.* at 21; *Id.* at 33);

v.      Discussions with parties at interest, e.g., brokers, sellers and buyers of easement encumbered properties (*Id.*);

vi.     Prior Tax Court proceeding addressing the valuation of easement encumbered properties (*Id.* at 19; *Id.* at 31); and

vii.    Information in the public domain discussing the impact conservation easements have on property (*Id.*).

Donnelly, a qualified appraiser, considered these factors, utilizing his extensive 30 years of experience appraising residential historical properties in the District of Columbia. Donnelly quantified the effect of the L'Enfant easements on

8

taxpayer's properties as a percentage of the before property easement value. (Ex. 9 at 21; A. ___; Ex 10 at 33; A.___.)

**5.    The Tax Court proceedings**

In support of his argument that the conveyance of the L'Enfant easement had no impact on the value of taxpayer's Logan Circle property, the Commissioner's appraiser, Peter Wolman, a senior IRS appraiser, analyzed the sale of four easement encumbered properties having characteristics identical to the Logan Circle property.  (Ex. 15 at 34-37; A. ___.)  Three of the four sales analyzed by Wolman resulted in a loss in value using Wolman's before easement value.  If Donnelly's before easement value is adopted, as it was by the Tax Court, all four comparable sales evidence a loss in value as a result of the easement.  The losses range from 14.34% to .68% of the pre contribution value of the property.  (*See* Brief of Appellee at 53-54 for computations).  In addition, in discussing eased property sales with third parties, Wolman was informed that a conservation easement in fact negatively affected the sale transaction of a buyer and seller.  (Ex. 15 at 35; A. ___.)  Despite this evidence, Wolman determined that the conveyance of the easements by taxpayer to L'Enfant had no impact on the value of her properties.

In establishing the more rigorous supervision of property by L'Enfant versus the HPO, taxpayer also relied on the testimony of the HPO State Historic

9

Preservation Officer. He testified that the HPO was not structured to monitor compliance with easement restrictions, that the HPO enforcement program was reactive and not proactive and that L'Enfant was a good steward of the preservation properties. (Doc. 36 at 85, 94; A.___.)

## 6.    The Tax Court opinion

The Commissioner alleges that the Tax Court determined that the appraisals were "qualified" because they substantially complied with the requirements of Treas. Reg. § 1.170A-13.  However, the Tax Court did not rely upon substantial compliance in determining that the appraisals were "qualified".  The Tax Court specifically held that "[t]he appraisals [taxpayer] obtained are qualified appraisals." (Doc. 41 at 17; A. ___.)  In addition to holding that the appraisals obtained by Taxpayer were qualified appraisals, the Tax Court also held that taxpayer complied with the substantiation requirements of I.R.C. § 170.  (*Id.* at 18.) The substantiation requirements referenced by the Tax Court include not only obtaining a qualified appraisal, but, in addition, attaching a fully completed appraisal summary to the tax return, and maintaining records in accordance with Treas. Reg. § 1.170A-13(b)(2)(ii).  Treas. Reg. § 1.170A-13(c)(2)(i).

## SUMMARY OF ARGUMENT

This federal income tax case involves the determination of whether: (i) property rights conveyed by the taxpayer to L'Enfant were "qualified conservation

10

contributions", the value of which are eligible for deduction under I.R.C. § 170(a); and (2) whether the value of the "qualified conservation contributions" were substantiated in accordance with Treas. Reg. § 1.170A-13(c)(2)(i).  At issue here is whether the taxpayer satisfied the statutory and regulatory requirements for claiming a charitable deduction of a conservation easement, a partial property interest.

The determination of whether taxpayer's conservation easement contributions are qualified conservation contributions is governed by I.R.C. § 170(h)(1).  Three requirements must be met to qualify as a qualified conservation contribution.  Two of the three requirements, namely, the "qualified real property interest" (I.R.C. § 170(h)(1)(A)) and the "qualified organization" (I.R.C. § 170(h)(1)(B)) requirements are not in issue.  The Commissioner alleges that the third requirement, "exclusively for conservation purposes" (I.R.C. § 170(h)(1)(C)) is not met because the conservation purpose is not protected in perpetuity.[4]  (Brief of Appellant at 28-29.)

The Commissioner argues that the conservation purpose is not protected in perpetuity because the easements do not prohibit L'Enfant from exercising its property rights to permit changes "inconsistent with the historical character of such

---

[4] The Commissioner concedes that the qualified real property interest requirement is satisfied, notwithstanding that the qualified real interest property requires that the property restriction be granted in perpetuity.  See I.R.C. § 170(h)(2)(C).

11

exterior". (Brief of Appellant at 29.) The Commissioner's argument is predicated on L'Enfant exercising its property rights contrary to (1) the laws governing the property, (2) the purposes set forth in its corporate charter, (3) IRS rules and regulations governing organizations described under I.R.C. § 501(c)(3), and (4) purposes and intent of the parties to the easements as expressed in the easement deeds.

Read in a vacuum, the consent and abandonment rights to which the Commissioner objects, "nothing herein contained shall be construed to limit [L'Enfant's] right to give consent…" (Ex. 7 at 3; A. ___; Ex. 8 at 3; A. ___), on its face is sufficiently broad to permit any action. However, the language must be properly construed in the context of the limitations imposed by law, L'Enfant's corporate charter, the IRS rules and regulations governing tax exempt organizations and the conservation purposes of the easement and when so read, the L'Enfant easement restrictions are protected in perpetuity.

The mere possibility that L'Enfant may take actions in contravention of the laws, regulations and agreements by which it is governed is not sufficient to defeat the perpetuity requirement if such possibility of occurrence, as of the date the easements are conveyed, is so remote as to be negligible. Treas. Reg. § 1.170A-14(g)(3). Based upon the testimony of Carol Goldman, the president of L'Enfant, and based upon the testimony of David Maloney, the HPO State Historic

12

Preservation Officer, the possibility that L'Enfant will act outside of the scope of

its corporate charter, outside the scope of the rules and regulations governing tax

exempt organizations, and outside the scope of the conservation easement is so

remote as to be negligible.  Accordingly, the easements satisfy the perpetuity

requirement.

The Tax Court found that the appraisals obtained by taxpayer were qualified

appraisals.  (Doc. 41 at 17; A. ____.)  Taxpayer's appraisals set forth the method of

valuation, namely a market methodology analyzing the considerations competent

buyers and sellers had, or are likely to have, in buying or selling property

encumbered by a façade easement.  (Ex. 9 at 20-21; Ex. 10 at 32-33.)  Neither the

Internal Revenue Code nor the Treasury Regulations specify a required valuation

method for determining the after easement value of property.  *See* Treas. Reg. §

1.170A-14(h)(3).  Because determining loss in value caused by use restrictions on

property is a complex issue, the Treasury Regulations require that the appraisals be

performed by qualified appraisers who, based upon their expertise and judgment,

determine the appropriate valuation methodology.  Treas. Reg. §§1.170A-

13(c)(3)(i)(B); -13(c)(5).

Taxpayer's appraiser, James Donnelly, is a qualified appraiser.  The

Treasury Regulations require only that the appraiser identify the valuation method

13

employed.  Treas. Reg. § 1.170A-13(c)(3)(ii)(J).  The selection of the valuation

method is left to the judgment and expertise of the appraiser.

     The valuation method utilized by Donnelly was appropriate under the facts

and circumstances existing as of the date of the contributions.  As evidenced by the

Commissioner's appraisal report, sufficient sales of eased properties did not exist

to support the use of the comparable sales method for after encumbered properties.

The valuation methodology used by Donnelly was reasonable, and his appraisal

report enabled the IRS to make a determination as to whether the valuation method

was acceptable to the IRS.

     As a basis for his valuation, the Donnelly appraisal reports identify and

discuss the manner in which the restrictions set forth in the easement impact and

affect the purchase price buyers are willing to pay for eased properties.  Donnelly

identified and considered a number of factors in his report as a basis for his

valuation.  Whether the IRS agrees or disagrees with the valuation basis utilized by

is not relevant for the qualified appraisal analysis.  The qualified appraisal rule

requires that the specific basis utilized by the appraiser be included in the report

and Donnelly includes in his reports the specific basis for his valuation in

compliance with Treas. Reg. § 1.170A-13(c)(3)(ii)(K).

     Finally, Donnelly's appraisal method and basis of valuation were

appropriate and more persuasive than that utilized by the Commissioner's

appraiser.  The record contains specific examples of how the factors considered by

Donnelly affect value and support a finding of a loss equal to at least 5% of the

before contribution property value.

Based upon the above, the findings of the Tax Court that taxpayer's

contributions were qualified conservation contributions, and that the appraisals

obtained by taxpayer were qualified appraisals, should be affirmed.

## ARGUMENT

**The Tax Court properly held that taxpayer is entitled to
charitable contribution deductions for easements granted to
L'Enfant because the easements were qualified conservation
contributions, and the appraisals obtained by taxpayer to
substantiate the values of the charitable contributions were
qualified appraisals**

## I

**The Tax Court properly held that the easements were "qualified
conservation contributions"**

**A.      Introduction**

The Internal Revenue Code provisions allowing deductions for conservation

easements are directed at the preservation of unique or otherwise significant land

areas or structures.  Treas. Reg. § 1.170A-14(d)(1).  Certified historic structures are

considered unique or otherwise significant structures.  I.R.C. §170(h)(4)(A)(iv);

Treas. Reg. §§ 1.170A-14(d)(1)(iv); -14(d)(5)(i).  "Certified historic structures"

include any building which is located in a registered historic district (as defined in

15

I.R.C. § 47(c)(3)(B)) and is certified by the Secretary of Interior to the Secretary of the Treasury as being of historic significance to the district.  I.R.C. § 170(h)(4)(B)(ii) (as in effect for contributions made prior to August 17, 2006); Treas. Reg. § 1.170A-14(d)(5)(iii).

The properties on which taxpayer conveyed conservation easements are both located within the Logan Circle Historic District, a registered historic district. (Doc. 36 at 74.)  Taxpayer's properties were, as of the time of contributions, and remain, certified by the Secretary of Interior to the Secretary of the Treasury as being of historic significance to the district.  (Ex. 9 at 19; A. ___; Ex. 10 at 31; A. ___.)  Thus, the provisions allowing deductions for conservation easements are directed at the preservation of taxpayer's properties.

To obtain a charitable deduction for a contribution of a conservation easement, the contribution must be a "qualified conservation contribution".  I.R.C. § 170(f)(3)(B)(iii)[5].  A conservation easement contribution must satisfy three tests to be a qualified conservation contribution.  First, the conservation easement contributed must be a "qualified real property interest".  I.R.C. § 170(h)(1)(A). Second, the conservation easement contribution must be made to a "qualified

---

[5] The Commissioner states that I.R.C. § 170(f)(11)(C), which statutorily requires a qualified appraisal for contributions in excess of $5,000, is applicable to taxpayer's contributions.  (Brief of Appellant at 34-35.)  This is not correct.  I.R.C. § 170(f)(11)(C) applies to contributions made after June 3, 2004.  American Jobs Creation Act of 2004, Pub. L. 108-357, § 883, 118 State. 1631.  The regulatory provisions of Treas. Reg § 1.170A-13(c) apply to taxpayer's contributions.

organization". I.R.C. 170(h)(1)(B). Finally, the contribution of the conservation

easement must be exclusively for conservation purposes. I.R.C. § 170(h)(1)(C).

**B.    Taxpayer's easements are qualified real property interests**

A "qualified real property interest" is an interest in real property that

constitutes a restriction (granted in perpetuity) on the use of which may be made of

the property. I.R.C. § 170(h)(2)(C). The easements both provide that the

conveyance to L'Enfant is "an easement in gross, in perpetuity, in, on, and to the

Property, the Building and the Façade…" (Ex. 7 at 2; A. ___; Ex. 8 at 2; A. ___.)

The Commissioner concedes that the easements are an interest in real property that

constitutes a restriction (granted in perpetuity) on the use which may be made of

taxpayer's properties. (Brief of Appellant at 38.)

**C.    L'Enfant is a qualified organization**

A "qualified organization" includes an organization described in I.R.C. §

501(c)(3) that meets the requirements of I.R.C. § 509(a)(2). I.R.C. § 170(h)(3).

L'Enfant is an organization described in I.R.C. § 501(c)(3) and the Tax Court

found and the Commissioner concedes that L'Enfant is a qualified organization.

(Brief of Appellant at 38-39; Doc. 41 at 3.)

17

**D.     The easements are exclusively for conservation purposes**

The "exclusively for conservation purposes" test consists of two

requirements.  First, the conservation purpose must be satisfied.  I.R.C. §

170(h)(4)(A).  Second, the conservation purpose must be protected in perpetuity.

I.R.C. § 170(h)(5)(A).

**1.     Conservation Purpose**

**a.     Preservation of certified historic structures is a
        conservation purpose**

The term "conservation purpose" includes the preservation of a "certified

historic structure".  I.R.C. 170(h)(4)(A)(iv).  A "certified historic structure" means

any building which is located in a registered district and is certified by the

Secretary of the Interior to the Secretary of the Treasury as being of historic

significance to the district.  I.R.C. 170(h)(4)(B)(ii) (as in effect for contributions

made prior to August 17, 2006).  Taxpayer's properties are "certified historic

structures".

The Commissioner concedes taxpayer's properties are certified historic

structures (Brief of Appellant at 39.)  Although the Commissioner concedes the

conservation purpose is not at issue, the Commissioner argues that the purpose test

is not satisfied because future alterations require only mere compliance with local

law.  (*Id*. at 43-47.)  In regards to historic preservation, future development rights

18

affect whether the restrictions defeat the purpose test.  Treas. Reg. § 1.170A-

14(d)(5)(i).

> **b.**     **A conservation easement may permit the easement holder the right to allow future development without defeating the conservation purpose requirement**

Treas. Reg. § 1.170A-14(d)(5)(i) provides in pertinent part:

> "When restrictions to preserve a building…within a registered historic district permit future development on the site, a deduction will be allowed under this section only if the terms of the restrictions require that such development conform with the appropriate local, state or Federal standards for construction or rehabilitation within the district."

To be designated a registered historic district, the district must be:

"[d]esignated under a statute of the appropriate State or local government…

certified by the Secretary of Interior to the Secretary as containing criteria which

will substantially achieve the purpose of preserving and rehabilitating buildings of

historic significance to the district…"  I.R.C. § 47(c)(3)(B)(ii).  Compliance with

local, state or Federal standards for construction or rehabilitation work within a

registered historic district definitionally satisfies the purposes test because the

statutes of the registered historic district have been certified as achieving the

purpose of preserving and rehabilitating buildings of historic significance.

Taxpayer's properties are located in a registered historic district.  (Doc. 36 at

74.)  The easements require that all work performed on the property, building and

façade comply with all applicable federal, state or local governmental laws and

regulations (Ex. 7 at 2; A. ___; Ex. 8 at 2; A. ___), falling squarely within the

parameters of Treas. Reg. § 1.170A-14(d)(5)(i).  Nonetheless, the Commissioner

argues the conservation purpose is defeated because conservation easements must

do more than simply require compliance with local law because if the easements

prohibit only what is prohibited by local law, "it is difficult to understand how

what you donated had any value at all."  (Brief of Appellant at 45.)

The Commissioner's arguments illustrate a fundamental misconstruction of

the conservation purposes requirement under I.R.C. § 170(h)(1)(C).  The

conservation purposes test must be satisfied in order for a donation of a partial

property interest to constitute a qualified conservation contribution.  *See* I.R.C. §§

170(f)(3); 170(h).  Thus, satisfying the conservation purposes test, and qualifying

as a qualified conservation contribution, simply makes the donation of the partial

property interest eligible for a charitable contribution, the value of which must be

subsequently determined.  *See* Treas. Reg. § 1.170A-14(h)(3) (addressing the

valuation of perpetual conservation restrictions).

Definitionally, the easements satisfy the conservation purposes test.

Whether the rights conveyed by the L'Enfant easement require more than mere

compliance with local laws is a factor properly considered in determining the after

easement value of the property, as noted by the Commissioner.  (Brief of

Commissioner at 45.)  Donnelly and the Tax Court both analyzed the easement

20

restrictions in comparison to the restrictions imposed by local law and properly

determined that the L'Enfant easements created an additional layer of

administrative consent, and imposed more onerous repair and maintenance

requirements than that required under local law, creating a greater economic

burden for property owners of easement encumbered properties versus non

encumbered properties.  (Doc. 41 at 23-24; A. ___; Ex. 9 at 19-20; A. ___; Ex. 10

at 31-32; A. ___.)

       The substantive nature of the L'Enfant consent rights is recognized under

local law.  District of Columbia Municipal Regulations, Title 10A, Section 308.4

requires that eased property owners first obtain the consent of the easement holder

for proposed property alterations prior to making application for a permit from the

HPO.  Occasionally, the HPO will approve a permit for alteration without the

required prior consent of the easement holder.  (Doc. 36 at 28-29; A. ___.)  This

occurred in the case of L'Enfant.  (*Id*.)  An owner, owning property subject to a

L'Enfant easement, sought and received a permit from the HPO to replace his

windows with vinyl clad windows.  (*Id*.)  The vinyl clad windows complied with

local law and the HPO approved the permit.  (*Id*.)  As part of its enforcement

program, the permit approval came to the attention of L'Enfant.  (*Id*.)  L'Enfant

generally does not permit vinyl replacement windows in historic buildings, and

would not permit vinyl replacement windows in this instance.  (*Id*. at 29.)  As a

result, notwithstanding the HPO permit authorizing the use of vinyl replacement windows, L'Enfant required the property owner to use replacement windows having a more historically satisfactory result.  (*Id*. at 30.)

Property owners must obtain the consent of L'Enfant to paint the exterior of the property.  (Doc. at 28; A. ___; Ex. 7 at 2; A. ___; Ex. 8 at 2; A. ___.) Properties subject to local law are not required to obtain a permit from the HPO to paint their buildings.  (Doc. 36 at 41.)  In one case, a L'Enfant easement property owner painted the building without the consent of L'Enfant, and L'Enfant initiated legal action.  (Doc. 36 at 41; A. ___.)  Ultimately, L'Enfant prevailed in the litigation matter, required the repainting of the house, and recovered $80,700 some odd dollars in reimbursement of the legal fees it expended.  (*Id*. at 42.)

Donnelly stated that the L'Enfant easements were more onerous than existing District of Columbia law.  (Ex. 9 at 19-20; A. ___; Ex. 10 at 31-32; A. ___.)  Carol Goldman illustrated the more onerous repair and maintenance requirements in the case of the procedures permitted to repair degradation in the exterior.  (Doc. 41 at 23-24, 39-40; A. ___.)

A common problem with older homes is degradation in the exterior.  (*Id*.) The District of Columbia often allows a homeowner to simply patch the masonry as problems develop.  (*Id*.)  However, too much patching can ultimately lead to a

need to paint the house.  (*Id*.)  L'Enfant does not allow patching, but instead requires the entire home to be "re-tucked", a more expensive process.  (*Id*.)

The Commissioner's interpretation of the easement provisions as requiring only compliance with federal, state and local governmental laws and regulations for consent purposes makes the consent rights conveyed to L'Enfant superfluous. The window replacement, exterior painting and re-tucking illustrations evidence that the L'Enfant easements require more than mere compliance with local law to obtain L'Enfant approval of proposed alterations.  Further, the examples evidence that the L'Enfant consent process is not a mere formality or window dressing subordinate to the HPO permit process.  The L'Enfant consent process is substantive, is required as a prerequisite to apply for an HPO permit, and requires additional time and expense on the part of easement property owners to obtain consents to property alterations than that required of non-easement property owners.

Contrary to the Commissioner's arguments, requiring compliance with local law for construction and rehabilitation work definitionally satisfies the conservation purposes test.  I.R.C. § 170(h)(4)(A)(iv); Treas. Reg. § 1.170A-14(d)(5).  In the context of valuation, the easements also impose an additional consent burden, and more onerous repair and maintenance burdens on L'Enfant easement property owners than non easement property owners, which subjects

23

such owners to a greater economic burden.  This economic burden was properly considered by both the taxpayer's appraiser and the Tax Court in determining the loss in value caused by the L'Enfant easement rights.

## 2.    Exclusively for conservation purposes

A contribution is not treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity.  I.R.C. § 170(h)(5)(A).  The Commissioner argues that the easements do not contain legally enforceable restrictions to protect the preservation of the certified historic structures in perpetuity because of the following language located in Article IV, Paragraph B of each easement: "…that nothing herein contained shall be construed to limit [L'Enfant's] right to give its consent (e.g. to changes in a Façade) or to abandon some or all of its rights hereunder." (Brief of Appellant at 40.)  According to the Commissioner, this language eliminates any claim to a prohibition on changes "inconsistent with the historical character of such exterior".  (Brief of Appellant at 40-42.)  Further, the Commissioner argues that the lack of a firm prohibition is evidenced by the right of L'Enfant to abandon some or all of its rights under each easement for "any number of reasons." (*Id.* at 42.)

The Commissioner's argument is fatally flawed.  Attempting to construe the rights and powers an agreement grants a party by isolating a specific phrase contained within an agreement without considering the statutory requirements

24

applicable to the property, the parties to the agreement, the organizational and statutory requirements which govern a party's conduct, or the agreement as a whole, can lead, as it does here, to illogical conclusions. The Commissioner's argument that the easement deeds permit L'Enfant the freedom and discretion to exercise its rights inconsistent with the "historical character or such exterior" is not supported by the laws governing the property, the organizational and statutory requirements governing L'Enfant, or by the easement deeds when read in their entirety. Accordingly, the consent and abandonment language referred to by the Commissioner does not defeat the perpetuity requirement.

> **a.     The conservation purpose of the easements is protected in perpetuity notwithstanding the rights of L'Enfant to consent to changes or abandon the easement rights**

Ms. Goldman testified at trial that the purpose of the consent and abandonment language at issue is to permit L'Enfant the flexibility to address future property issues, whatever they may be. (Doc. 36 at 31-32.) Because the easement is in perpetuity, if subsequent unforeseen changes make continued use of eased properties financially impractical or impossible, some mechanism must exist for the financial protection of L'Enfant and any and all other conservation easement holding entities.

25

Treas. Reg. § 1.170-14(g)(6)(i) addresses unforeseen or sudden changes in the

context of extinguishing easement restrictions.  Treas. Reg. § 1.170A-14(g)(6)(i)

provides in pertinent part:

> "If a subsequent unexpected change in the condition surrounding the
> property that is the subject of a donation under this paragraph can
> make impossible or impracticable the continued use of the property
> for conservation purposes, the conservation purpose can nonetheless
> be treated as protected in perpetuity if the restrictions are extinguished
> by judicial proceeding and all of the donee's proceeds (determined
> under paragraph (g)(6)(ii) of this Section) from a subsequent sale or
> exchange of the property are used by the donee organization in a
> manner consistent with the conservation purposes of the original
> contribution."

Perpetuity is a long time.  In the course of perpetuity, changes will take

place.  Like Treas. Reg. § 1.170A-14(g)(6), the L'Enfant easements are drafted to

provide L'Enfant the flexibility to address changes.  However, this flexibility must

at all times be exercised subject to the laws restricting the property, the corporate

purpose of L'Enfant, the IRS rules and regulations governing L'Enfant and the

purpose and intent of the easement.  As such, L'Enfant may not exercise its rights

in a manner inconsistent with the historical character of the property.

Taxpayer's properties are located in a registered historic district and subject

to laws intended to preserve the historical significance of the buildings.  *See* I.R.C.

§ 47(c)(3)(B); D.C. § 6-1101 *et al.*  Neither L'Enfant nor the property owner may

take actions contrary to those laws.  Further, as an I.R.C. § 501(c)(3) organization,

L'Enfant must be operated exclusively for its exempt purposes.  Treas. Reg. §

26

501(c)(3)-1(a)(1) (providing an I.R.C. § 501(c)(3) organization "must be both organized and operated exclusively for one or more of the purposes specified in such section.  If an organization fails to meet either the organizational test or the operational test, it is not exempt.")  To remain qualified as an exempt organization, L'Enfant's activities must be in furtherance of its exempt purposes.  Treas. Reg. § 1.501(c)(3)-1(c)(1) (providing "an organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes…")

The Commissioner's argument further fails to properly consider the chartered purpose of L'Enfant and the purpose and intent of the parties to the conservation deed.  To meet the operations test, L'Enfant's activities must be in furtherance of its exempt purposes.  Treas. Reg. § 1.501(c)(3)-(1)(c)(1).  The purpose of L'Enfant is to preserve historically important properties by holding and enforcing conservation easements on historically designated properties in Washington D.C. (Doc. 41 at 3; A. ___.)  The intent and purpose of taxpayer and L'Enfant to preserve taxpayer's property is manifested within the easement deeds:

(i)     L'Enfant's chartered purpose is to preserve historically important properties.  (Ex. 7 at 1; A. ___; Ex. 8 at 1; A. ___.)

(ii)    The intent of the parties to the easement is that the façade, building and property remain essentially unchanged.  (*Id.*)

27

(iii)   Taxpayer is prohibited from making alterations which would materially alter or change the appearance of the façade, from making new or additional improvements on the property, and from painting or cleaning the façade in a manner incompatible with the protection or preservation of the façade without the consent of L'Enfant, which, except in the case of alterations to repair damages to the façade, may be withheld or conditioned or delayed in the sole and absolute discretion of L'Enfant.  (Ex. 7 at 2; A. ___; Ex. 8 at 2, A.__.)

(iv)   Taxpayer is required to maintain the property, building and façade in good repair and condition at all times.  (*Id.*)

(v)    All work to be performed on the façade must comply with all applicable federal, state and local governmental laws.  (*Id.*)

(vi)   L'Enfant has the right to enter and inspect the façade, to initiate legal proceedings to enforce violations by temporary or permanent injunction, to collect damages, including attorney fees, and to enter onto the property to correct violations.  (Ex. 7 at 3; A. ___; Ex. 8 at 3, A.__.)

(vii)  Taxpayer and all successors are bound by these restrictions in perpetuity, and the easement survives the termination of L'Enfant. (*Id.*)

28

    (viii)  Transfer or assignment by L'Enfant of the easement is prohibited

          unless the transferee is a qualified organization.  (*Id.*)

    (ix)    If the easement is ever extinguished, through condemnation, judicial

          decree or otherwise, L'Enfant is entitled to receive a portion of the

          proceeds, from any sale, exchange or conversion equal to the same

          proportion as the value the initial easement donation bore to the entire

          value of the property at the time of donation.  (*Id.*)

Reading the language quoted by the Commissioner, "nothing herein shall be construed to limit the grantee's right to give consent (e.g. to the changes in the façade) or to abandon some or all of its rights hereunder" in the context of the laws governing the property and L'Enfant, L'Enfant's chartered purpose and the purpose and intent of L'Enfant and taxpayer as expressed in the deed make clear that the easement contributions are protected in perpetuity.

The Commissioner's argument that the perpetuity requirement is defeated because the easements do not contain any provisions detailing what happens to the easements upon termination of L'Enfant's existence, or upon abandonment by L'Enfant of its rights of enforcement (Brief of Appellant at 42-43) is also without merit.  In determining that L'Enfant is an I.R.C. § 501(c)(3) exempt organization, the IRS has determined that L'Enfant meets the organizational test under Treas. Reg. § 1.501(c)(3)-1(c).  The organizational test requires a finding by the IRS that

29

upon dissolution of L'Enfant or abandonment by L'Enfant of its assets, the

L'Enfant assets, or the proceeds from the sale of such assets, whether by reason of

L'Enfant's charter or by operation of law, will be distributed for one or more

exempt purposes. *See* Treas. Reg. § 1.501(c)(3)-1(b)(4) (providing an

organization's assets will be considered dedicated to an exempt purpose if, upon

dissolution, such assets would, by reason of a provision in the organization articles

or by operation of law be distributed for one or more exempt purposes, or to a

governing body for a public purpose.")

The prior findings of the IRS were confirmed at trial by Carol Goldman and

David Maloney, the State Historic Preservation Officer. Both Goldman and

Maloney testified that, in the event of abandonment, whether by termination of an

organization's existence or otherwise, the preservation easements revert to the

District of Columbia and the HPO. (Doc. at 33, 93-95.) In fact, at the time of the

Tax Court proceedings, L'Enfant and the HPO were working in conjunction to

have certain preservation easements, abandoned by another preservation easement

holding organization, assigned to L'Enfant so that L'Enfant could continue to

enforce the restrictions granted in the easements and protect the conservation

purpose of the easements in perpetuity.[6] (*Id.*) The rules and regulations governing

---

[6] Although local law provides that abandoned preservation easements are to be held and administered by the HPO, the State Historic Preservation Officer, testified that in such situations, the HPO seeks to have the easements assigned to other

tax exempt organizations and the testimony of the L'Enfant president and the HPO

State Historic Preservation Officer confirm that if L'Enfant dissolves or abandons

its easement rights, the easement rights will be protected in perpetuity.

Based upon all of the above, the L'Enfant easements contain "legally

enforceable restrictions… that will prevent uses of the retained interest inconsistent

with the conservation purposes of the donation" (Treas. Reg. § 1.170A-14(g)(1))

and satisfy the perpetuity requirement of I.R.C. § 170(h)(5)(A).

>    **b.    The conservation purpose is protected in perpetuity**
>           **notwithstanding the possibility exists that L'Enfant may**
>           **take actions which are in contravention of its corporate**
>           **charter and in contravention of the conservation purpose**
>           **expressed in the easement**

As the Tax Court noted, the Commissioner's argument that the conservation

purpose may be defeated by actions of L'Enfant is premised on the possibility

L'Enfant can consent to changes even if the changes are in contravention of the

law, in contraction of its corporate charter, in contravention of the conservation

purposes set forth in the easement, and in contravention of the parties' intent as

expressed in the easement.  (Doc. 41 at 10; A. ____.)  Granted, any person may

take, at any future time, actions which are contrary to agreements to which he, she

---

easement holding entities because of its inability to effectively enforce the
easement restrictions.  According to the State Historic Preservation Officer: "[w]e
prefer not to have the burden of enforcing easements.  It's something we're not
really administratively set up to do because we really don't have the time to go out
annually, or however often, to affirmatively inspect properties.  As I testified, our
enforcement response is really responsive; it's not affirmative".  (Doc. 36 at 94.)

or it is bound.  However, the record establishes that L'Enfant is not likely to take such actions.  The mere possibility of such action does not defeat the perpetuity requirement.  Treas. Reg. § 1.170A-14(g)(3).

L'Enfant celebrated its 30th anniversary as an I.R.C. § 501(c)(3) organization in 2008.  (Doc. 36 at 11; A. ___.)  The founders of L'Enfant were Washingtonians.  (*Id.*)  During 1978, "midnight" demolition was occurring throughout the city.  Buildings were being razed at night.  (*Id.*)  At that time, the National Trust for Historic Preservation was an easement holding entity.  (*Id.*)  Steve Goldman and Chuck Auster founded L'Enfant to provide locality to the preservation movement.  (*Id.* at 12.)

At all times, L'Enfant has operated exclusively in furtherance of its exempt purpose, as confirmed by an audit conducted by the IRS.  (*Id.* at 13.).  L'Enfant enjoys a good working relationship with the city and in particular, the HPO.  (*Id.* at 27, 84.)  The State Historic Preservation Officer testified that L'Enfant is a good steward of the easement rights maintained by L'Enfant.  (Doc. 36 at 94, A. ___.)  As noted earlier, the State Historic Preservation Officer testified that the HPO was at that time working with L'Enfant to accept assignments of preservation easements from a defunct easement holding organization because L'Enfant was better able than the HPO to assume the burden of enforcing the easements.  (*Id.* at 94.)

32

The Treasury Regulations provide that the perpetuity requirement is not defeated by the performance of some act or the happening of some event, if, on the date of the gift, it appears that the possibility that such act or event will occur is so remote as to be negligible.  Treas. Reg. § 1.170A-14(g)(3).  The Treasury Regulations provide as  an example of a remote possibility a state that has a statutory requirement that use restrictions be recorded every thirty years to remain in force.  *Id.*  The possibility that the use restriction may not be recorded does not, by itself, render the use restriction non-perpetual.  *Id.*

Based upon the record, the likelihood or possibility of L'Enfant taking actions inconsistent with its tax exempt purposes, the conservation purposes set forth in the easements, or the intent of the parties to the easements is so remote as to be negligible, and accordingly, does not defeat the perpetuity requirement.

### c.  The mortgagees of taxpayer's properties properly subordinated their rights in the properties to the rights of L'Enfant to enforce the conservation purposes in perpetuity

Per Treas. Reg. § 1.170A-14(g)(2), the perpetuity requirement is satisfied in the case of mortgaged property if the mortgagee subordinates its rights to the right of the qualified organization to enforce the conservation purposes in perpetuity.

The mortgagees holding mortgages encumbering taxpayer's properties properly subordinated their rights in the properties to the right of L'Enfant.  Article IV, Paragraph D of each easement provides in pertinent part:

33

The Property is currently encumbered by a Deed of Trust recorded in the land records of the District of Columbia securing a loan payable to [_____] ("Lender"). Lender hereby subordinates its rights in the Property to the rights of (L'Enfant), its successors or assigns, to enforce the conservation purposes of this Easement in perpetuity and ***joins in the execution of this Conservation Easement the sole and limited purpose so subordinating its interest.*** (emphasis added.)(Ex. 7 at 4, A.___; Ex. 8 at 4, A. ___.)

Taxpayer's mortgagees joined in the execution of the easements and are parties to the easements. By being a party to the easements, the rights of the mortgagees are legally subordinated to the rights of L'Enfant to enforce the conservation purposes of the easement in perpetuity.

## II

### The Tax Court properly held that taxpayer satisfied the substantiation requirements for contributions of property in excess of $5,000

### A.     Introduction

Generally, an individual claiming a non-cash charitable contribution of more than $5,000 is required to comply with substantiation requirements set forth in Treas. Reg. § 1.170-13(c)(2).[7] The substantiation requirements consist of the following three requirements:

1.  Obtain a qualified appraisal of such property;

---

[7] I.R.C. § 170(f)(11), added as part of the American Jobs Creation Act of 2004, Pub. L. 108-357, 883, 118 Stat. 1631, and cited by the Commissioner as governing non cash charitable deductions of more than $5,000 is effective for contributions made after June 3, 2004 and is not applicable to taxpayer's contributions.

2.  Attach a fully-completed appraisal summary (i.e., Form 8283) to the tax
    return on which the deduction is claimed; and

3.  Maintain records pertaining to the claim deduction in accordance with Treas.
    Reg. § 1.170A-13(b)(2)(ii).

Treas. Reg. § 1.170A-13(c)(2).

The Commissioner maintains that the taxpayer did not satisfy the qualified
appraisal substantiation requirement because (1) the "appraisals fail to explain the
methods of valuation"; and (2) fail to include "any substantive basis for their
valuations".  (Appellant's Brief. at 49.)  At trial, taxpayer maintained that
taxpayer's appraisals were qualified appraisals, and even if the appraisals did not
satisfy all the requirements of a qualified appraisal, taxpayer substantially
complied with those requirements. (Doc. 41 at 17; A. ___.) The Tax Court held
taxpayer's appraisals were qualified appraisals, finding all the regulatory
requirements were satisfied.  (*Id.* at 17-18.)

**B.     Taxpayer's appraisals are qualified appraisals**

**1.     Qualified appraisal defined**

A "qualified appraisal" is an appraisal document that:

> "(A)    Relates to an appraisal that is made not earlier than
> 60 days prior to the date of contribution of the appraised
> property nor later than [the due date of the return on
> which a deduction is first reported, or, in the case of a
> deduction first reported on an amended return, the date
> on which the return is filed];

35

(B)    Is prepared, signed, and dated by a qualified appraiser;

(C)    Includes the information required by [Treasury Regulation § 1.170A-13(c)(3)(ii)]; and

(D)    Does not involve an appraisal fee prohibited by [Treasury Regulation § 1.170A-13(c)(6)]." Treas. Reg. § 1.170A-13(c)(3)(i).[8]

Treas. Reg. § 1.170A-13(c)(3)(ii) requires that the appraisal document include the following information:

A    A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain what property is appraised;

B.    the physical condition of the property;

C.    the date of contribution;

D.    the terms of any agreement or understanding entered into by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed;

E.    the name and address of the qualified appraiser;

F.    the qualifications of the appraiser who signs the appraisal;

---

[8] The Commissioner argues that taxpayer's appraisals are not qualified appraisals as required by I.R.C. § 1.170(f)(11)(C). As noted earlier, I.R.C. § 170(f)(11)(C) is not applicable to taxpayer's contributions. Instead, taxpayer's contributions are subject to the regulatory processes of Treas. Reg. § 1.170A-13(c)(2).

G.     a statement that the appraisal was prepared for income tax purposes;

H.     the date on which the property was appraised;

I.     the appraised fair market value of the contribution;

J.     the method of valuation used to determine the fair market value; and

K.     the specific basis for the valuation.

### 2.  Taxpayer's appraisals were timely prepared

The Donnelly appraisals were both prepared no earlier than 60 days prior to the date the easements were contributed to L'Enfant  (Ex. 9 at 2; A.___; Ex 10 at 1; A.___.), satisfying Treas. Reg. § 1.170A-13(c)(3)(i)(A).

### 3.  Taxpayer's appraiser is a qualified appraiser

Donnelly conducted the appraisals and authored taxpayer's appraisal reports on behalf of J. Lee Donnelly and Sons, Inc.  (Ex. 9; A. ___; Ex. 10; A. ___.) Donnelly is a qualified appraiser as defined in Treas. Reg. §1.170A-13(c)(5).  J. Lee Donnelly and Sons, Inc. is the oldest real estate appraisal firm in Washington D.C., founded by Donnelly's grandfather, circa. 1920. ( Doc. 36 at 56.)  Donnelly runs and is the chief residential appraiser for all residential cases.  (*Id.*)  He began his appraisal apprenticeship in the summer of 1971, while in high school.  (*Id*.)  He joined the firm in June, 1976.  He has appraised residential properties for more than 30 years (Doc. 41 at 5; A. ___) with expertise in appraising Washington D.C. and Montgomery County residential properties.  (Doc 36 at 56; A. ___.)  He is

37

licensed, certified and a designated appraiser for the Appraisal Institute. (*Id.*) He holds the SRA designation and, again, is responsible for all residential appraisals in Washington D.C. (Doc. 36 at 56-57.)

In his appraisal experience dating back to the mid-1970s, he has appraised many of the historic mansions in all District of Columbia jurisdictions, including Georgetown, Capitol Hill, Logan and Dupont. (*Id.*) Personally, he has expertise in appraising homes aged in excess of 70, 80, 90, 100 years or more. (*Id.*) With regard to education, he has attended a number of seminars and written books and has spoken at a number of seminars. Donnelly satisfies the requirements of Treas. Reg. § 1.170A-13(c)(3)(i)(B).

**4. Taxpayer's appraisals include the information required by Treas. Reg. §1.170(A)-13(c)(3)(ii)**

**a. Taxpayer's appraisals provide an adequate description of the property contributed (Treas. Reg. § 1.170A-13(c)(3)(ii)(A))**

A qualified appraisal must include a description of the property donated in sufficient detail for a person who is not familiar with the type of property to ascertain what was (or will be) contributed is the property appraised. Treas. Reg. §1.170A-13(c)(3)(ii)(A). The property interests contributed by taxpayer to L'Enfant are perpetual restrictions on the future use and alteration in, on and to the taxpayer's properties. (Ex. 9 at 22-27; A. ___; Ex. 10 at 34-38; A. ___.) Taxpayer's appraisals describe the underlying real properties, the improvements to

38

the properties and the scope of the easements being conveyed.  (Ex 9 at 2, 8, 13-13,

20, 22-26; A.__; Ex. 10 at 1, 5, 12, 16, 32, 34-38; A.__.)  Each appraisal also

includes a copy of the proposed "Conservation Easement Deed of Gift" setting

forth and describing the property interests to be conveyed.  (*Id.*)  Accordingly,

taxpayer's appraisals adequately describe the property contributed in sufficient

detail to enable a person not familiar with the property to ascertain the property

contributed is the property appraised.

> **b.**     **Taxpayer's appraisals adequately describe the physical condition of the underlying property (Treas. Reg. § 1.170A-13(c)(3)(ii)(B))**

The requirement applies to donations of tangible property and thus, is not

applicable to the property interest conveyed to L'Enfant.  Treas. Reg. § 1.170-

13(c)(3)(ii)(B).  A property interest consisting of perpetual restrictions on the

future use and alteration of property has no physical condition and as such, the

appraisals cannot describe the physical condition of such interests.  However, the

appraisals do describe the physical condition of the underlying real property and

include a description of the property interests to be conveyed to L'Enfant.  (Ex. 9 at

10, 22-27; A.__; Ex. 10 at 16, 34-38; A. ___.)

> **c.**     **Taxpayer's appraisals set forth the date of contribution (Treas. Reg. § 1.170A-13(c)(3)(ii)(C)**

Included as part of taxpayer's appraisals were Forms 8283, which were

executed by the appraiser, Mr. Donnelly.  (Ex. 9 at 29; A. ___; Ex. 10 at 40; A.

___.)  Both appraisals were updated as of the date of the donation (Ex. 9 at 2; A.

___; Ex. 10 at 1; A. ___.) and new Forms 8283 were executed as of those dates

(Ex. 5 at 14; A. ___; Ex. 6 at 16; A. ___.)  Because the appraisals were updated as

of the date of contribution and included updated Forms 8283 setting forth the date

of contribution, the appraisals satisfy Treas. Reg. § 1.170A-13(c)(3)(ii)(C).

**d.** **The terms of any agreement or understanding entered into by or on behalf of the donor or donee that relates to the use, sale or other disposition of the property contributed (Treas. Reg. § 1.170A-13(c)(3)(ii)(D))**

This provision is not applicable since there were no terms of any agreement

or understanding entered into by the appraiser and taxpayer relating to the use, sale

or other disposition of the property contributed.

**e.** **Taxpayer's appraisals include the name and address of the qualified appraiser and the qualifications of appraiser (Treas. Reg. § 1.170A-13(c)(3)(ii)(E);(F))**

Both appraisals contain the name and address of J. Lee Donnelly & Sons,

Inc., and the qualifications of James Donnelly and Jill Rothman, the appraisers

who conducted the appraisal. ( Ex. 9 at 1, 30-34; A. ___; Ex. 10 at 4, 48-52; A.

___.)

**f.** **Taxpayer's appraisals include a statement that the appraisals were prepared for income tax purposes (Treas. Reg. § 1.170A-13(c)(3)(ii)(G))**

Taxpayer's appraisals each discuss the income tax rules governing the

donation of façade easements (Ex. 9 at 15-16; A. ___; Ex. 10 at 27-28; A. ___) and

40

include an executed Form 8283, the statement taxpayers are required to attach to *income tax returns* claiming a charitable deduction in excess of $5,000 (emphasis added). (Ex. 9 at 29; A.____; Ex. 10 at 40; A.____.) The appraisals state taxpayer is contemplating a donation of a conservation easement to L'Enfant, contain narratives of the income tax benefits applicable to contributions of conservation easements, the IRS rules applicable to contributions of conservation easements, and Tax Court cases addressing the valuation of conservation easements for income tax purposes. (Ex. 7 at 15-19; A. ____; Ex. 8 at 27-31; A. ____.) The donation discussion set forth in the body of the appraisals and Forms 8283 executed by the appraiser and attached to the appraisals, together satisfy the income tax purpose requirements of Treas. Reg. § 1.170A-13(c)(3)(ii)(G).

> **g.    Taxpayer's appraisals include the date on which the property was appraised (Treas. Reg. § 1.170A-13(c)(3)(ii)(H))**

Each appraisal contains the valuation date of the appraisal, and both appraisals were updated to the date of contribution, satisfying Treas. Reg. § 1.170A-13(c)(3)(ii)(H). (Ex. 9 at 2; A.____; Ex. 10 at 1; A. ____.)

41

### h.     Taxpayer's appraisals include the appraised fair market value of the contribution (Treas. Reg. § 1.170A-13(c)(3)(ii)(I))

The appraisals set forth the appraised fair market value of the easements as required by Treas. Reg. § 1.170A-13(c)(3)(ii)(I). (Ex. 9 at 3; A.___; Ex. 10 at 2; A.___.)

### i.     Taxpayer's appraisals include the method of valuation used to determine the fair market value and the specific basis of the valuation (Treas. Reg. § 1.170A-13(c)(3)(ii)(J) and (K))

The Treasury Regulations provide that a qualified appraisal shall include:

(J)The method of valuation to determine the fair market value, such as the income approach, the market data approach and the replacement cost less depreciation approach; and (K) the specific basis for the valuation, such as specific comparable sales transactions or a statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed."  Treas. Reg. § 1.170A-13(c)(ii)(J) and (K).

The Commissioner concedes that, with respect to determining the before market value of the property, taxpayer's appraisals set forth the method of valuation and the basis of the valuation.  (Brief of Appellant at 52.)

### j.     Taxpayer's after easement appraisal method

The Treasury Regulations provide that the value of a perpetual conservation easement contribution is the fair market value of the perpetual conservation restriction at the time of contribution.  Treas. Reg. § 1.170A-14(h)(3)(i).  In the absence of a substantial number of marketplace sales of conservation easements,

the general rule is that the fair market value is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the property after the granting of the restriction. *Id.* However, the Treasury Regulations do not provide any suggested valuation methodology for determining the value of after restricted property. *See generally* Treas. Reg. § 1.170A-14(h)(3). The manner of valuing after restricted property is left to the judgment of the appraiser, hence the requirement that such appraisals be performed by qualified appraisers. *See* Treas. Reg. § 1.170A-13(c)(5), setting forth the qualifications of a qualified appraisal.

Taxpayer's appraiser, Donnelly, and the Commissioner's appraiser, Wolman, both agreed that no substantial record of marketplace sales of easements were available to use for purposes of valuing taxpayer's contributions. Instead, both appraisers determined the value of the contribution on the basis of the difference between the fair market value of the property before the contribution of the conservation restriction, and the fair market value of the property after contribution of the conservation restriction, consistent with Treas. Reg. § 1.170A-14(h)(3)(ii). (Ex. 9; A. ___; Ex. 10; A. ___; Ex. 17; A. ___.)

Donnelly's report acknowledges that determining the "loss in value" resulting from the placement of use restrictions is complex and that the measurement or impact is difficult to quantify with any supported precision. (Ex. 9

43

at 21; A. ___.; Ex. 10 at 33; A. ___.)  Donnelly likens the practice of determining
the value of after easement property to condemnation valuation practices where
easements or partial fee interests are taken from property owners by a sovereign
and "[a]ttempts must be made to define what rights have been lost by the property
owners and what elements of damage (or enhancement) are involved in the loss".
(*Id*. at 20; *Id.* at 32.)  Recognizing that real property is not bought and sold in a
vacuum, Donnelly valued taxpayer's after easement property by examining and
quantifying the considerations competent buyers and sellers actually had, or are
likely to have, in buying or selling a property encumbered by a façade easement.
(*Id.* at 20-21; *Id*. at 32-33.)  This is the method of valuation utilized by Donnelly
and disclosed in the appraisal report to determine the fair market value of the after
easement property satisfying Treas. Reg. § 1.170A-13(c)(3)(ii)(J).

In addition to determining that Donnelly properly disclosed the after
easement valuation methodology (Doc. 41 at 18), the Tax Court properly found
Donnelly's valuation more persuasive than the valuation performed by Wolman,
the Commissioner's appraiser.  (Doc. 41 at 24).  Although Donnelly and Wolman
were both qualified appraisers, Donnelly was more experienced and qualified than
Wolman in valuing historic residential properties in the District of Columbia, and
his valuation methodology was more appropriate under the circumstances than that
utilized by Wolman.

44

Donnelly was a member of the oldest real estate appraisal firm in Washington D.C., founded by his grandfather circa 1920.  (Doc. 36 at 57; A. ___.) He joined the company in June 1976 and his practice, through 2004, focused solely on appraising residential properties in the District of Columbia.  (*Id*.)  He is licensed, certified and a designated appraiser with the Appraisal Institute.  (*Id*.)  He held and holds the SRA designation.  (*Id*.)  During 2003 and 2004, he ran, and was the chief residential appraiser for all residential cases for J. Lee Donnelly and Sons, Inc.  (*Id*.)  He performed appraisals for many of the historic residential mansions located in Georgetown, Capitol Hill, Logan Circle, Cleveland Park and Dupont Circle.  (*Id*. at 58.)  Further, appraising preservation easements was an active part of his practice during 2003 and 2004.  (*Id*. at 59.)

In contrast, Wolman's experience with appraising residential historic properties located within the District of Columbia was limited.  He was employed by the IRS in September 2007.  (Doc. 36 at 101; A. ___.)  Prior to becoming employed by the IRS in late 2007, he had not done any residential preservation appraisals.  (*Id*. at 102.)  Wolman's curriculum vitae indicates that his primary appraisal experience had been with commercial type properties.  (Ex. 15 at 50-52; A. ___; Ex. 16 at 53-55; A. ___.)  For purposes of preparing the Vermont Avenue and Logan Circle appraisal reports, Wolman purportedly increased his historical

45

property easement knowledge by referencing Appraisal Institute textbooks[9] and by

associating with an IRS real estate appraiser having specialized experience with

valuation of façade conservation easements "who was available for consultation".

(Ex. 15 at 6; A. ___; Ex. 16 at 6-7; A. ___.)  Since commencing work with the

IRS, in addition to taxpayer's appraisals, Wolman performed only two other

appraisals of historic residential property easements.  (Doc. 36 at 101; A. ___.)

    As noted above, Donnelly utilized the market approach for valuing

taxpayer's after easement properties, examining the considerations buyers took

into account in acquiring properties encumbered with a façade easement, and using

his experience and expertise, quantifying those factors.  Wolman used a

comparable sales method of valuation for the after easement properties.  (Ex. 15;

A. ___; Ex. 16; A. ___.)

    For purposes of his Logan Circle after easement comparable sale analysis,

Wolman utilized four properties.  (Ex. 15 at 34-35; A. ___.)  Only one of the four

comparable properties was located in the Logan Circle historic district.  (Ex. 15 at

37; A. ___.)  Moreover, the Logan Circle comparable sale property did not go into

contract nor sell until after the date taxpayer conveyed the Logan Circle easement

---

[9] Please note that one treatise utilized by Wolman was not in print at the time the easements were contributed by taxpayer to L'Enfant.  Wolman utilized a treatise, Judith Reynolds, *Historic Properties: Preservation and the Valuation Process*, 3rd Ed. (Chicago: Appraisal Institute, 2006).  (Ex. 15 at 6; A. ___; Ex. 16 at 7; A. ___.) The third edition was not published until 2006, at least two years after the applicable valuation dates.

46

to L'Enfant.  (*Id.*)  Finally, Wolman's comparable sale property one, located in Dupont Circle, sold in November 2003.  (Ex. 15 at 37; A. ___.)  Because the specific date of the sale is not provided, it is unclear whether this information was available to Donnelly.  (*Id.*)  Query whether two comparable sales provide sufficient data for purposes of determining a loss in value caused by easement restrictions?

Lacking a substantial record of comparable sales of after easement properties, Donnelly instead valued taxpayers after easement properties taking into account factors considered by buyers in acquiring eased properties, and quantifying the economic effect of those factors on the value of the property.  (Ex. 9 at 20-21; A. ___; Ex. 10 at 32-33; A. ___.)  Donnelly's valuation method, taking into account factors that buyers consider in the marketplace, was more appropriate under the circumstances than the comparable sales method utilized by Wolman.

### k.    The basis of the valuation, factors and considerations relevant to buyers and sellers of façade easements

The factors examined by Donnelly which buyers are likely to take into account in acquiring a property encumbered with a façade easement which Donnelly used as a basis for his valuation included: (1) maintenance and repair requirements that are more onerous than the maintenance and repair requirements under local law (Ex. 9 at 19-20; A. ___; Ex. 10 at 32-33; A. ___); (2) the portion of the property exterior subject to the L'Enfant easement, being an envelope easement

47

encompassing the entire exterior, versus a "public view" easement governing only portions of the exterior viewable by the public (*Id*. at 20; *Id.* at 32); (3) the inability to make changes to the color, windows, door or exterior design to accommodate changes in market preferences (*Id*. at 18; *Id.* at 30); (4) the loss of the exclusive use of the property (*Id*.); (5) enhanced financial exposure if the easement restrictions are breached (*Id*. at 20, 24; *Id.* at 32, 36); (6) subjecting the property to a more formal and rigid inspection program than that operated by the HPO (*Id*. at 20; *Id*. at 32); (7) judicial decisions addressing the valuation of easement restrictions (*Id*. at 19; *Id*. at 31); and (8) information available in the public domain regarding the impact easement restrictions have on property values. (*Id*.)

The enhanced maintenance and repair requirements and economic effect of such burdens to which a L'Enfant easement property owner is subjected was previously discussed herein in the context of maintaining the brick exterior of homes like taxpayer's, wherein property owners are required to "re-tuck" the entire home in lieu of patching degradation in the exterior (Doc. 41 at 23-24) and, in the context of suitable replacement windows. (Doc. 36 at 28-29.) Further, the L'Enfant easement subjects the property owner to painting and color regulations, whereas local law does not. (Doc. 36 at 41.) In one case, a property owner repainted the home without the consent of L'Enfant, and was required to repaint

48

the house and reimburse L'Enfant for the legal fees incurred by L'Enfant in enforcing its easement rights (approximately $80,000). (*Id.* at 42.)

The scope of the L'Enfant easement was also considered. Although "façade" is sometimes used generically in the context of preservation easements, the meaning of the term can vary based upon how the term is defined in the easement document. (Doc. 36 at 21; A. ___.) For example, a façade may be defined to encompass only the portion of the building viewable by the public (e.g., a public view easement). (*Id.*) Whereas a public view easement encompasses only the portion of the building viewable by the public, an envelope easement encompasses the entire exterior of the property and the airspace around the property. (*Id.*) The L'Enfant easement is an envelope easement. (Doc. 36 at 21; A. ___; Ex. 7 at 2; A. ___; Ex. 8 at 2; A. ___.)

With regard to the loss of property rights, unlike a property subject to local laws, in the event of fire or condemnation, a portion of the proceeds are payable to L'Enfant as a property owner. (Ex. 7 at 4; A. ___; Ex. 8 at 4; A. ___.) If the value of the easement at the time of contribution was ten percent of the value of the property, the property is entitled to only ninety percent, versus one hundred percent of the proceeds, and the remaining ten percent is payable to L'Enfant. (Doc. 36 at 35; A. ___.)

49

The L'Enfant easement subjects property owners to a more formal and periodic inspection program than that conducted by the HPO.  (Doc. 36 at 36-39, 91-92: A. ___.)  The HPO's enforcement program is reactive, and not proactive.  (Doc. 36 at 91-92, 94; A. ___.)  The L'Enfant enforcement program is proactive.  (Doc. 36 at 36-39.)  L'Enfant routinely writes all property owners every year for the purpose of ascertaining whether the eased property has sold without the knowledge of L'Enfant (Doc. 36 at 36-37.)  L'Enfant inspects each property every year.  (*Id*.)  L'Enfant photographs every property every year.  (*Id*.)  L'Enfant plaques each of their properties.  (*Id*.)

L'Enfant also engages in a permit review process, receiving from the HPO and reviewing building permits and in addition, receives permits submitted to the Commission of Fine Arts.  (*Id*. at 37.)  L'Enfant maintains a sophisticated database and all data is imported into the data bank.  (*Id*. at 38.)  The database contains a tab on all current property owners and includes all historical and historically significant information about the property.  (*Id*.)  The database contains a tab for enforcement, which includes requests for changes and notes possible violations and violations.  (*Id*.)  There is a gallery of photography so that the property's appearance can be compared to the prior year appearance on an annual basis.  (*Id*. at 39.)

50

Donnelly also considered judicial decisions addressing the value of after easement properties.  (Ex. 9 at 19; A. ___; Ex. 10 at 31; A. ___.)  Clearly, such information is relevant to a buyer of an eased property.  Finally, Donnelly examined and considered information available in the public domain to buyers of eased properties discussing the impact easements have on the value of properties.  Included in the information examined was a Washington Post article published in June 2002, and an IRS article, available on the IRS website, discussing façade easement contributions.  (*Id*. at 19, 44-48; *Id*. at 31, 54-56, 59.)

The Commissioner takes issue with Donnelly's consideration of an article authored by an IRS employee and available to the public on the IRS website discussing façade easement contributions.  (Brief of Appellant at 52-53)  (Ex. 9 at 46-48; A. ___; Ex. 10 at 54-57; A. ___.)  The article states "Internal Revenue Service Engineers have concluded that proper valuation of a façade easement should range from approximately 10%-15% of the value of the property."  (*Id*. at 47; A. ___; *Id*. at 55; A. ___.)  Is not an article addressing the impact a façade easement has on property, written by an IRS employee, and available on the IRS website, a factor knowledgeable buyers would consider in acquiring an eased property?  Unfortunately, buyers of easement encumbered property in 2003 and 2004 did not have the benefit of the IRS disavowing the article more than three years later.  (*See* Brief of Appellant at 52, footnote 14.)

51

Contrary to the Commissioner's assertions that Donnelly's appraisals did not explain the diminution of property value attributable to the easements (Brief of Respondent at 56-57), the appraisals clearly set forth the basis for Donnelly's findings, namely the factors that influence a buyer of façade easements and the purchase price buyers are willing to pay for façade easement properties. Donnelly's reports satisfy the requirements of Treas. Reg. § 1.170A-13(c)(3)(ii)(K) and contain sufficient information to enable the IRS to evaluate the reasonableness of the valuation. Further, contrary to the Commissioner's assertion that the value of the restrictions was arrived at by "[picking] a percentage out of thin air" (Brief of Respondent at 58), the appraisals and record, including Commissioner's appraisal reports, more than substantiate the ultimate value of the restriction rights as determined by the Tax Court.

Wolman utilized four comparable sale properties in determining the after easement value of the Logan Circle properties. (Ex. 15 at 37; A. ___.) Ignoring for the moment only one of the four comparable sales properties was located in the Logan Circle historic district and two of the four comparable sale properties did not go into contract or sell until after the date taxpayer conveyed the Logan Circle easement (Ex. 15 at 37; A. ___), Wolman's analysis evidences a loss in value as a result of the easements. Comparable sale property one (located in Dupont Circle) sold in November 2003. (Ex. 15 at 37; A. ___.) Because the specific date of the

52

sale was not provided, it is not clear whether this information would have been available to Donnelly.  Nonetheless, Wolman determined that the value of comparable sale property one was $1,070,700.  (*Id*.)  Utilizing Donnelly's before easement value of $1,250,000, the value adopted by the Tax Court, the loss in value is $179,300, or 14.34%.[10]  Utilizing Wolman's before easement value of $1,175,000, the loss in value is 8.67%.[11]  (*Id*.)

Wolman determined that the after easement value of comparable sale property two (located in Dupont Circle) was $1,155,200.  (*Id*.)  The loss in value is 7.58%[12] as a result of the easements using Donnelly's pre-contribution value and 1.68%[13] using Wolman's pre-easement values.

Wolman determined that comparable property three had a pre-contribution value of $1,238,800.  (*Id*.)  The property suffered a loss in value of $11,200, or .68%[14] based on Donnelly's pre-contribution value and an increase in value of 4.5%[15], utilizing Wolman's values.

Comparable property four was located in Logan Circle.  (*Id*.)  Wolman determined that the after easement value of comparable property four was $1,173,100.  (*Id*.)  Using Donnelly's before easement value of $1,250,000, the loss

---

[10] $1,250,000 - $1,070,700 / $1,250,000 = 14.34%
[11] $1,175,000 - $1,070,700 / $1,175,000 = 8.67%
[12] $1,250,000 - $1,155,200 / $1,250,000 = 7.584%
[13] $1,175,000 - $1,155,200 / $1,175,000 = 1.68%
[14] $1,250,000 - $1,253,800 / $1,250,000 = .68%
[15] $1,175,000 - $1,238,800 / $1,175,000 = 5.4%

in value is $76,900, or 6.15% of the before easement value.[16]  Importantly in

regards to the Logan Circle comparable sale property, the buyers claimed the

conservation easement encumbering the property was not disclosed and sought

damages.  (*Id*. at 35.)  Ultimately, the sellers agreed to credit buyers $10,000.

Taking this loss into account, the decrease in value increases to $86,900, or 6.95%

of the pre-easement value.  Query whether the sales price would have been further

reduced if the conservation easement was fully disclosed to buyer at the

commencement negotiation process versus immediately prior to closing?

     Carol Goldman also testified that L'Enfant was previously involved in

litigation involving the nondisclosure of conservation easements by a seller to the

buyer.  (Doc. 36 at 30-41.)  Goldman's testimony and Wolman's Logan Circle

comparable evidence that marketplace buyers considered preservation easements

an economic detriment in their purchase price decision making process and the Tax

Court properly concluded the preservation easements negatively impact the value

of taxpayer's properties.  (Doc. 41 at 24, 26.)

     Based upon the above, the Tax Court properly found that Wolman's reports

were not credible as far as they maintain that an easement would have absolutely

no effect on the fair market value of valuable real estate.  (Doc. 41 at 26; A. ___.)

Further, the fact that Wolman utilized valuation treatises, which were not in

---

[16] $1,250,000 - $1,173,100 / $1,250,000 = 6.15%.

existence as of the date of taxpayer's contributions, to support his valuation

conclusions further justifies the findings of the Tax Court that Wolman's appraisal

reports were not credible.  Specifically, Wolman increased his façade easement

conservation specific knowledge by referencing Appraisal Institute textbooks

including Judith Reynolds' *Historic Properties; Preservation and Valuation*

*Process*, 3rd Edition (Chicago: Appraisal Institute, 2006).  (Ex. 15 at 6; A. ___; Ex.

16 at 7; A. ___.)  Throughout his reports, Wolman cites extensively to the Judith

Reynolds treatise.  (*See* Ex. 15 at 11, 21, 23 and 24; Ex. 16 at 11, 22, 23 and 24.)

As of the date of taxpayer's contributions, the Judith Reynolds treatise was

in its second edition.  The third edition was not published until 2006, at least two

years after the applicable valuation dates.  The propriety of utilizing treatises by

appraisers is not at issue.  However, the treatises used by appraisers should be

treatises which were available to appraisers at the time the contributions were

made.  For example, Wolman cites to the Judith Reynolds treatise, third edition, to

support his findings that the easements do not require "excess repair and

maintenance".  (Ex. 15 at 11; A. ___; Ex. 16 at 11; A. ___.)  The Judith Reynolds

treatise second edition does not contain this statement and instead, makes

assertions contrary to Wolman's findings: that preservation easements do create

"excess repair, maintenance and related costs".  Ms. Reynolds, in her second

edition, states:

55

"Owners are often willing to donate easements – at least in part –
because they are reasonably content with the condition of the property
at the time of the easement.  Some owners, particularly those of single
family dwellings and completely rehabilitated properties, frequently
do not foresee the effect the changes in economic conditions and
building technology will have over time.  Owners of commercial
property, owners of unrehabilitated properties, owners of timberland
and owners of land with subdivision potential do not usually share this
kind of shortsightedness.  ***However, the market value of all types of
properties is diminished the moment the easement is conveyed.  The
diminution varies broadly with the type of property and the
provisions of the easement but it always exists, even as a minor
amount.  Given the choice between two properties of equal qualities,
one that is free of preservation or conservation easement and one
that bears an easement – assuming equal qualities, the market will
rationally select the unencumbered real property.  The encumbered
property would be selected only at a lower price.  The difference in
the two represents the easement value.***"  Judith Reynolds, _Historic
Properties: Preservation and the Valuation Process_, 2nd ed.
(Chicago: Appraisal Institute, 1997), 107-108. (emphasis added)

Finally, the fact Wolman ignored the influence information available to

buyers at the time of taxpayer's contribution had on value, namely information

available to the public via the IRS website stating that façade easements negatively

impact the value of property, evidences the bias inherent in Wolman's valuation

process.

Donnelly's appraisals are qualified appraisals and set forth the basis for

Donnelly's determination of the after easement value of taxpayer's properties.  In

addition, taking into consideration Donnelly's expertise and experience, the

information analysis contained in Donnelly's reports, the findings set forth in

Wolman's appraisal reports, and the testimony before the Tax Court, the Tax

56

Court's determination that the L'Enfant easements caused a reduction in the value of taxpayer's property equal to at least 5% of the pre-easement values should be affirmed.

### III

### The requirements of Treas. Reg. § 1.170A-13(c)(3) may be fulfilled by substantial compliance

Although the Tax Court found that Taxpayer's appraisals were qualified appraisals, if this Court determines otherwise, it should find that the Donnelly appraisals substantially complied with the substantive requirements of Treas. Reg. § 1.170A-13(c)(3). The Commissioner argues that the substantial-compliance doctrine is inapplicable, claiming that the provisions of Treas. Reg. § 1.170A-13(c)(3) are mandatory and not, as the Tax Court has previously concluded, directory. (Brief of Appellant at 50-58.) That argument, however, is flawed as the cases cited by Commissioner and the general rule arising therefrom relate to legislative regulations that concern the essence of the underlying statutes at issue. *See generally, United States v. Mead Corp.*, 533 U.S. 218 (2001); *Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency*, 489 F.3d 1221 (D.C. Cir. 2007).[17] In

---

[17] In support of its contention, Commissioner relies upon separate holdings by the Supreme Court in *U.S. v. Mead Corp.* and the Appeals Court for the District of Columbia in *Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency* relating to interpretation of legislative regulations. (*Id*. at 55.) Commissioner's argument that *U.S. v. Mead Corp.* and *Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency* are binding upon the present case relating to Treas. Reg. § 1.170A-13(c)(3) is an

the present case, the application of the provisions of Treas. Reg. § 1.170A-13(c)(3) do not relate to the essence of I.R.C. §170.

The Tax Court has determined that the primary inquiry in determining whether full compliance with a statute or regulation is required is whether procedural requirements of the statute or regulation relate "to the substance or essence of the statute" they support. *Taylor v. Commissioner*, 67 T.C. 1071, 1077 (1977) (citing *Sperapani v. Commissioner*, 65 T.C. 308, 331 (1964)). In this case, the essential component of I.R.C. §170 is the allowance of charitable deductions for contributions or gifts made to qualified organizations. *Bond v. Commissioner*, 100 T.C. 32, 41 (1993). In that light, the Tax Court in *Bond* provided that an appraisal's compliance with the requirements of Treas. Reg. § 1.170A-13(c)(3) is not essential in the determination of whether Taxpayer's underlying charitable act pursuant I.R.C. §170 has taken place. *Id*., (stating that the reporting requirements under Treas. Reg. § 1.170A-13(c)(3) "do not relate to the substance or essence of

---

extension of their related holdings that is clearly contradictory to prior holdings of the Tax Court. *See Bond v. Commissioner*, 100 T.C. 32, 41 (1993). If the Court were to accept Commissioner's argument that that *U.S. v. Mead Corp.* and *Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency* are applicable to procedural or directory regulations, such as Treas. Reg. § 1.170A-13(c)(3), the substantial-compliance doctrine would be rendered moot. For what purpose would the substantial-compliance doctrine exist if all regulations were to be accorded strict compliance? Accordingly, Commissioner's argument of the applicability of *U.S. v. Mead Corp.* and *Nat'l Assn. of Clean Air Agencies v. Envtl. Prot. Agency* upon Treas. Reg. § 1.170A-13(c)(3) is misguided and the Court should decline its invitation to expand their authority.

whether or not a charitable contribution was actually made"). The Tax Court in *Bond* went on to hold that Treas. Reg. § 1.170A-13(c)(3) is directory, which permitted the taxpayer to utilize the substantial-compliance doctrine. *Id.*, (quoting *Taylor v. Commissioner*, 67 T.C. 1071, 1077-78 (1977)). As in *Bond*, any technical non-compliance of the Donnelly appraisals with Treas. Reg. § 1.170A-13(c)(3) does not relate to the essence of Taxpayer's underlying charitable contribution, and this Court should therefore utilize the substantial-compliance doctrine when reviewing the present case.

The Tax Court has determined that under the substantial-compliance doctrine, "if requirements are procedural or directory in that they are not the essence of the thing being done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict, compliance." *Taylor v. Commissioner*, 67 T.C. 1071, 1077-78 (1977) (citing *Dunavant v. Commissioner*, 63, T.C. 316 (1974)). The Donnelly appraisals substantially comply with Treas. Reg. § 1.170A-13(c)(3). Accordingly, any purported "technical" failures of the Donnelly appraisals to accord with Treas. Reg. § 1.170A-13(c)(3) are not fatal to the deductibility of easements reported by the Taxpayer.[18]

---

[18] Commissioner references the Tax Court's decision in *Hewitt v. Commissioner* in support of its conclusion that the Taxpayer is seeking to overcome the need to substantiate the value of a charitable deduction. (Brief of Appellant at 56-57.) Commissioner's reference to *Hewitt* and its argument relating thereto, however, are misguided and is illusory. In *Hewitt*, the Tax Court denied the taxpayer's claim for

## CONCLUSION

The Tax Court's decisions should be affirmed.

Respectfully submitted,


/s/ Robert J. Onda

ROBERT J. ONDA              (614) 716-0504
TIMOTHY S. RANKIN           (614) 716-0501
Attorneys
Onda, LaBuhn, Rankin & Boggs Co., LPA
266 North Fourth Street, Suite 100
Columbus, Ohio  43215
rjo@olrblaw.com
tsr@olrblaw.com

---

a charitable deduction not because the taxpayer's appraisal lacked specific components that caused it to fall short of the qualified appraisal requirements, but because the taxpayer failed to submit any appraisal.  *See generally, Hewitt v. Commissioner*, 109 T.C. 258 (1997).  The present case is clearly distinguishable as the Donnelly appraisals were timely submitted and contained sufficient information to substantiate the amount charitable deductions claimed by Taxpayer.

60

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X]  this brief contains 13,519 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and Circuit Rule 32(a)(2), or

    [ ]  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]  this brief has been prepared in a proportionally spaced typeface (Times New Roman, 14 point font) using Microsoft Office Word 2007, or

    [ ]  this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

/s/ Robert J. Onda
ROBERT J. ONDA
Attorney for Appellee

Dated: November 1, 2010

61

# United States Court of Appeals
## for the District of Columbia Circuit

SIMMONS v COMMISSION OF IRS, No. 10-1063

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by ONDA, LABUHN, RANKIN & BOGGS CO., LPA, Attorneys for Appellee Dorothy Jean Simmons to print this document. I am an employee of Counsel Press.

On **November 1, 2010**, Counsel for Appellant has authorized me to electronically file the foregoing **BRIEF OF APPELLEE** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Patrick J. Urda
patrick.urda@usdoj.gov
US Department of Justice
Tax Division, Appellate Section
P.O. Box 502
Washington, DC 200004

*Counsel for Appellate*

Matthew A. Eisenstein
Matthew.Eisenstein@aporter.com
Arnold & Porter, LLP
555 Twelfth Street, NW
Washington, DC 20004

*Counsel for Amici Curiae*

Unless otherwise noted, 8 paper copies have been sent to the Court on the same date via Federal Express.

November 1, 2010

/s/ Elissa Matias
Elissa Matias

62