**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# No. 10-1063

————

In the

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

*Appellant,*

v.

DOROTHY JEAN SIMMONS,

*Appellee.*

ON APPEAL FROM THE UNITED STATES TAX COURT
(HON. JOSEPH R. GOEKE, JUDGE)

————

**BRIEF OF *AMICI CURIAE* THE NATIONAL TRUST FOR HISTORIC
PRESERVATION, THE L'ENFANT TRUST, AND FOUNDATION FOR
THE PRESERVATION OF HISTORIC GEORGETOWN
IN SUPPORT OF APPELLEE DOROTHY JEAN SIMMONS
(SUPPORTING AFFIRMANCE)**

Matthew A. Eisenstein
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
202-942-5000

November 16, 2010

## CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

A.      *Parties and Amici.* All parties and *amici curiae* appearing in this Court are listed in the Brief for Appellant.

B.      *Rulings under Review.*  References to the rulings at issue appear in the Brief for Appellant.

C.      *Related Cases.*  Counsel for *amici curiae* is not aware of any previous or pending related cases in this Court.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES.....................i

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS ...................................................vi

IDENTITY OF AMICI CURIAE, THEIR INTERESTS IN THE CASE,
    AND THE SOURCE OF THEIR AUTHORITY TO FILE .............................1

SUMMARY OF ARGUMENT .................................................................5

ARGUMENT .........................................................................................12

I.    The Tax Court Correctly Found That The Easements Were
    "Exclusively For Conservation Purposes.".....................................12

    A.   L'Enfant's Retention of a Right To Approve Changes Cannot
       Defeat The Deductions. ...........................................................12

    B.   L'Enfant's Retention of a Right To Abandon Cannot Defeat The
       Deductions. ...........................................................................16

    C.   The Easements Need Not Detail What Happens If L'Enfant Ceases
       To Exist or Abandons Its Rights of Enforcement. ...................19

    D.   The Mortgagees Subordinated Their Interests To The Rights of
       L'Enfant.................................................................................20

II.   The Tax Court Correctly Concluded That The Easements Caused A
    Diminution of Value For Both Properties........................................21

CONCLUSION ......................................................................................30

PERTINENT STATUTES AND REGULATIONS ..................................31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
    REQUIREMENTS................................................................................32

CERTIFICATE OF SERVICE ...............................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Evans v. Comm'r*,
  T.C.M. (RIA) 2010-207 (2010) .......................................................................22

*Griffin v. Comm'r*,
  56 T.C.M. (CCH) 1560 (1989) ........................................................................24

*Herman v. Comm'r*,
  98 T.C.M. (CCH) 197 (2009) ..........................................................................23

*Hilborn v. Comm'r*,
  85 T.C. 677 (1985).....................................................................................15, 24

*Hughes v. Comm'r*,
  T.C.M. (RIA) 2009-094 (2009) .......................................................................23

*Nicoladis v. Comm'r*,
  55 T.C.M. (CCH) 624 (1988) ..........................................................................24

*Schwab v. Comm'r*,
  67 T.C.M. (CCH) 3004 (1994) ........................................................................23

*Stotler v. Comm'r*,
  53 T.C.M. (CCH) 973 (1987) ..........................................................................18

*Whitehouse Hotel Ltd. Partnership v. Comm'r*,
  615 F.3d 321 (5th Cir. 2010) ...........................................................................22

**STATUTES**

16 U.S.C. §§ 461-468.............................................................................................1

Internal Revenue Code (26 U.S.C.)

*§ 501(c)(3).......................................................................................1, 9, 14, 16

*§ 170(b)(1)(A)(vi) ...........................................................................................20

**Authorities on which we chiefly rely are marked with asterisks.**

TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*§ 170(h) ................................................................ 2, 3, 5, 6, 8, 9, 10, 12, 13, 25

D.C. Code

§ 6-1101 ................................................................................................ 25

§ 29-301.48 ........................................................................................... 19

§ 29-301.53 ........................................................................................... 15

§ 29-301.56 ........................................................................................... 19

§ 42-201 .................................................................................................. 5

§ 42-202 ........................................................................................... 16, 23

Pension Protection Act of 2006, Pub. L. No. 109-280, § 1213(a)(1), 120
   Stat. 780 ............................................................................................ 12

Tax Reform Act of 1976, Pub. L. No. 94-455, § 2124, 90 Stat. 1520 ..................... 5

Tax Treatment Extension Act of 1980, Pub. L. 96-541, § 6(a), 94 Stat. 3206 .......... 6

RULES AND REGULATIONS

*26 C.F.R. § 1.170A-1(e) ............................................................... 10, 15, 18

*26 C.F.R. § 1.170A-14 ................................................ 9, 10, 12, 14, 15, 16, 20, 21

*26 C.F.R. § 1.501(c)(3)-1(c) ............................................................... 14, 19

36 C.F.R. Part 67 ......................................................................................... 14

LEGISLATIVE MATERIALS

General Explanation of the Tax Reform Act of 1976 (H.R. 10612, 94th
   Congress, Public Law 94-455), prepared by the Joint Committee on
   Taxation, JCS-33-76, 94th Cong. (1976) .......................................................... 5, 6

H.R. Rep. No. 96-1278, 96th Cong., 2d Sess. (1980) .............................................. 6

S. Rep. No. 96-1007, 96th Cong., 2d Sess. (1980) ............................................. 6, 20

TABLE OF AUTHORITIES (cont'd)

**Page(s)**

MISCELLANEOUS

Ann E. Marimow, *Standing Their Ground: Montgomery Proposal Divides Preservationists, Land Owners*, WASH. POST, June 5, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/06/04/AR2009060404430.html ............................ 28, 29

CCH IRS Letter Rulings Reports No. 181, August 21, 1980; I.R.S. P.L.R. 8032013 (Apr. 14, 1980) ..................................................................................... 15

Charter, Internal Revenue Service Advisory Council, *available at* http://www.irs.gov/pub/irs-utl/irsac_2009_renewal_charter.pdf. .................. 3, 19

District of Columbia, Historic Preservation Office Enforcement Program, *available at* http://planning.dc.gov/planning/frames.asp?doc= /planning/lib/planning/preservation/enforcement/hp_enforcement_prioriti es.03.09.pdf .................................................................................................... 25

Marc Fisher, *Chevy Chase DC Rejects Historic Status*, WASH. POST, Oct. 20, 2008, *available at* http://voices.washingtonpost.com/rawfisher/2008/10/chevy_chase_dc_rej ects_histori.html .............................................................................................. 29

Mark Primoli, *Façade Easement Contributions*, FEDERAL HISTORIC PRESERVATION TAX INCENTIVES, NATIONAL PARK SERVICE (Sept. 7, 2000) .............................................................................................................. 29

National Park Service, Sample Conservation Easement Agreement for a Save America's Treasures Grant (Historic Building), *available at* http://www.nps.gov/history/hps/treasures/download/SAT_sample_ease ment.pdf ........................................................................................................... 7

Report of Internal Revenue Service Advisory Council (IRSAC), November 2009, *available at* http://www.irs.gov/taxpros/article/0,id= 215543,00.html ............................................................................................. 3, 29

Stephen J. Small, THE FEDERAL TAX LAW OF CONSERVATION EASEMENTS (2d ed. Land Trust Alliance 1990) ....................................................................... 7

THE CONSERVATION EASEMENT HANDBOOK (Elizabeth Byers & Karen M. Ponte, Eds., 2d ed. Land Trust Alliance 2005) ........................................... 2, 5, 6

## GLOSSARY OF ABBREVIATIONS

HPO          District of Columbia Historic Preservation Office

IRS          Internal Revenue Service

IRC          Internal Revenue Code

L'Enfant     The L'Enfant Trust

## IDENTITY OF AMICI CURIAE, THEIR INTERESTS IN THE CASE, AND THE SOURCE OF THEIR AUTHORITY TO FILE

A.     Identity of *Amici Curiae*

The National Trust for Historic Preservation in the United States is a non-profit organization chartered by Congress in 1949 to further the historic preservation policies of the United States and to "facilitate public participation" in the preservation of our nation's heritage. 16 U.S.C. §§ 461-468. The L'Enfant Trust is a non-profit corporation chartered under the laws of the District of Columbia in 1978 to protect and to promote the aesthetic integrity of Washington, D.C.'s historic neighborhoods. The Foundation for the Preservation of Historic Georgetown is a non-profit corporation chartered under the laws of the District of Columbia in 1965 to preserve and protect the character of the historic area of the District of Columbia known as Old Georgetown.

The IRS has determined that each of the three *amici curiae* is an exempt organization pursuant to 26 U.S.C. § 501(c)(3). Pursuant to Fed. R. App. P. 26.1, counsel for *amici curiae* has certified that no parent company or other corporation owns any stock or other interest in the three organizations. The Attorney General of the United States is a statutory ex officio member of the Board of Trustees of the National Trust, as is the Secretary of the Interior. *See* 16 U.S.C. § 468b.

B.     Interest of *Amici Curiae* In the Case

*Amici curiae* have a significant interest in the outcome of this matter.  For well over thirty years, they and other qualified organizations collectively have accepted thousands of donations of preservation easements from owners of historic properties.[1]  L'Enfant holds preservation easements on more than 1,100 buildings in Washington, D.C., including the two easements donated by Appellee Dorothy Jean Simmons at issue here.  The Foundation for the Preservation of Historic Georgetown holds preservation easements on more than 110 buildings in Washington, D.C.  The National Trust for Historic Preservation holds more than 100 easements on historic properties across the country, and, with over 190,000 members nationwide, it carries out a wide range of programs and activities in support of historic preservation, as provided under its federal charter.

The arguments of the Commissioner in this case, if credited, would have far-reaching and harmful consequences for *amici curiae* and historic preservation efforts in this country.  Congress created the charitable tax deduction in Section 170(h) of Title 26, United States Code (the Internal Revenue Code or IRC) to encourage private landowners to donate preservation easements to nonprofit

---

[1]     Conservation easements have been used in the United States for more than a century, although their use by nonprofit conservation and preservation organizations did not become commonplace until the 1970s.  *See* THE CONSERVATION EASEMENT HANDBOOK (Elizabeth Byers & Karen M. Ponte, Eds., 2d ed. Land Trust Alliance 2005), at 10-11.

preservation organizations and government entities.  To the extent the

Commissioner *incorrectly* concludes that a preservation easement is not donated

"exclusively for preservation purposes" or valueless, the Commissioner deprives

the taxpayer of that incentive and undermines the purpose of § 170(h).  That is

what happened in this case.

     The Commissioner's arguments here are not isolated.  In recent years, the

Commissioner has advanced similar positions to challenge charitable deductions

for donations of preservation easements throughout Washington, D.C. and the

country.[2]  *Amici curiae* agree that the Commissioner must actively guard against

abusive practices.  But the Commissioner must apply § 170(h) consistent with its

language, in a manner that does not hinder the conduct that Congress meant to

encourage.  As a result of the Commissioner's arguments here and in similar cases,

donations of preservation easements have dwindled and in some communities have

---

[2]     As explained by the Internal Revenue Service Advisory Council—a
Committee authorized by the Federal Advisory Committee Act to provide a public
forum for IRS officials and representatives of the public to discuss relevant tax
administration issues—the Commissioner has undertaken a "wide-ranging
initiative" to audit charitable deductions claimed by donors of historic preservation
easements.  *See* Report of Internal Revenue Service Advisory Council (IRSAC),
November 2009, *available at* http://www.irs.gov/taxpros/article/0,,id=
215543,00.html (hereafter "IRSAC Report"); Charter, Internal Revenue Service
Advisory Council, *available at* http://www.irs.gov/pub/irs-
utl/irsac_2009_renewal_charter.pdf.  As that Council observed correctly:  "[t]here
is concern that any donor will hesitate to make a donation, regardless of the quality
of the appraisal or the legitimacy of the donation, if the donor knows that he or she
is thereby 'buying an audit.'"  IRSAC Report, at 3.

virtually ended,[3] impeding the ability of historic preservation organizations like *amici curiae* to fulfill their missions.  Consequently, the issues in this case are critically important to *amici curiae*.

C.    Source of Authority to File

The source of authority for filing this brief is Fed. R. App. P. 29 and D.C. Cir. Rule 29(b), and the Notice of Intent to Participate as *Amici Curiae* timely filed with the consent of all parties on April 30, 2010.

---

[3]    For example, between 2000 and 2005, L'Enfant received an average of 127 easement donations per year.  L'Enfant received 36 donations in 2006; 32 donations in 2007; 11 donations in 2008; 5 donations in 2009; and 0 donations thus far in 2010.

## SUMMARY OF ARGUMENT

Preservation easements represent a uniquely effective preservation tool to protect historic and cultural treasures from demolition or inappropriate alteration. When a nonprofit conservation organization accepts such a donation from an owner of a historic building, the organization receives a property right to approve or deny changes to the exterior appearance of the property.[4] Nonprofit conservation organizations and governmental agencies have used preservation easements to protect thousands of architectural landmarks and historic places.

Congress recognized the benefits of preservation easements by creating an important financial incentive—a charitable tax deduction—to encourage private landowners to donate such easements to nonprofit preservation organizations and government entities.[5] Section 170(h) of the Internal Revenue Code authorizes the

---

[4]     Preservation easements are a subcategory of "conservation easements," a term used to describe restrictions on title that are created to protect conservation values, including those relating to open space, agricultural lands, forests, scenic areas, natural habitat, and historic or architecturally significant properties. *See* THE CONSERVATION EASEMENT HANDBOOK, *supra* note 1, at 3. Conservation easements are creatures of state law, running to the benefit of a nonprofit conservation organization or governmental agency. *See* D.C. Code § 42-201 *et seq.*

[5]     The Tax Reform Act of 1976, Pub. L. No. 94-455, § 2124, 90 Stat. 1520, codified deductions for charitable contributions made "exclusively for conservation purposes." At the time, Congress explained that "the rehabilitation and preservation of historic structures and neighborhoods is an important national goal. Congress believes that the achievement of this goal is largely dependent upon whether private funds can be enlisted in the preservation movement. Tax considerations have an important bearing on whether private interests are willing to maintain and rehabilitate historic structures rather than allow them to deteriorate or replace them with new buildings." General Explanation of the Tax Reform Act of

Footnote continued on next page

treatment of such donations as "qualified conservation contributions." The statute

defines a "qualified conservation contribution" to include a donation "of a

qualified real property interest" (IRC § 170(h)(1)(A)), "to a qualified organization"

(IRC § 170(h)(1)(B)), "exclusively for conservation purposes" (IRC §

170(h)(1)(C)).

As the Commissioner emphasizes in this case, to be treated as "exclusively

for conservation purposes," a donated property right must be protected "in

perpetuity." IRC § 170(h)(5). The "perpetuity" requirement does not mean that a

nonprofit conservation organization must forever preserve a historic property in a

frozen state, impervious to *any* change over time. Nor could it. As the expression

goes, "Perpetuity is a very, very long time."[6] Buildings must be adaptable to new

circumstances, and changing surroundings and economics. A historic property—

even a museum property—will not be sustainable on a long-term (much less

---

Footnote continued from previous page
1976 (H.R. 10612, 94th Congress, Public Law 94-455), p. 643, prepared by the
Joint Committee on Taxation, JCS-33-76, 94th Cong. (1976).

The Tax Treatment Extension Act of 1980, Pub. L. 96-541, § 6(a), 94 Stat.
3206, extended permanently the deductions allowed such contributions. In so
doing, Congress recognized "the increasingly important role that conservation
easements have come to place in the movement to conserve and protect the
country's natural resources and its cultural heritage." H.R. Rep. No. 96-1278, 96th
Cong., 2d Sess. 15 (1980); *see also* S. Rep. No. 96-1007, 96th Cong., 2d Sess. 9
(1980).

[6]      THE CONSERVATION EASEMENT HANDBOOK, *supra* note 1, at 143.

perpetual) basis unless some degree of change can be accommodated to make a building livable or usable for future generations.

Historic preservation easements therefore must anticipate, and accommodate, change necessary to allow sustainable use by an evolving society—as long as that change is consistent with conservation purposes.[7]  Indeed, a preservation easement that lasts *forever* must provide sufficient flexibility to ensure that a historic building can be used and enjoyed forever by future residents, while protecting and respecting the past.  This is precisely the reason that historic preservation easements—*including model easements promulgated by the federal government itself* [8]—contemplate that change may be permitted by an easement-holding organization within restrictions designed to ensure the satisfaction of conservation purposes.

Consequently, a nonprofit charitable organization that holds a preservation easement must have the ability to *regulate* change, to exercise its judgment to allow or disallow change consistent with the purpose of the easement to protect the

---

[7]    Stephen J. Small, THE FEDERAL TAX LAW OF CONSERVATION EASEMENTS (2d ed. Land Trust Alliance 1990), at 11-7, 11-8.

[8]    See, for example, the sample easement recommended by the National Park Service for properties receiving funds under the Save America's Treasures program.  National Park Service, Sample Conservation Easement Agreement for a Save America's Treasures Grant (Historic Building), *available at* http://www.nps.gov/history/hps/treasures/download/SAT_sample_ease ment.pdf.

historic or architectural values or attributes of the property.  No responsible

preservation organization would create or hold an easement that simply *prevents*

change.

 In this case, the Commissioner challenges this critical function of a

preservation easement-holding organization.  In doing so, the Commissioner

challenges decades of practice by nonprofit preservation organizations and

governmental institutions at the federal, state, and local levels.  The Commissioner

complains that because the easements at issue gave L'Enfant the unfettered ability

to determine whether change is appropriate, that authority includes the power to

"consent to changes without regard to preservation purposes," and to "abandon its

rights for any number of reasons."  (Brief of Appellant at 29.)  The Commissioner

further asserts that the easements do not delineate the consequences if L'Enfant

"ceases to exist," and that the mortgagees did not recognize that their interests

were subordinated to L'Enfant.  (*Id.* at 30, 41-43.)  Therefore, the Commissioner

posits, the easements are not "exclusively for preservation purposes" under

170(h)(1)(C).

 These arguments ignore the essential responsibility of an easement-holding

organization to exercise its discretion to meet the preservation purposes of the

easement document and the purposes of the organization itself.  In making the

argument, the Commissioner appears to call into question L'Enfant's commitment

to its IRC § 501(c)(3) exempt purpose and its charter, its 32 years of responsible

operations (affirmed by IRS audits), as well as the terms of the easement deeds.

There is no dispute here that, at the time of the donation, L'Enfant was a "qualified

organization" with "a commitment to protect the conservation purposes of the

donation" and the "resources to enforce the restrictions."[9]  26 C.F.R. § 1.170A-

14(c)(1).  And the easement deeds afford L'Enfant the discretion to control change,

while constraining L'Enfant's power to act in a manner inconsistent with

conservation purposes.  The Commissioner appears to suggest that, because of the

remote possibility that L'Enfant might abuse its discretion, the easement is invalid

as non-perpetual; this is akin to arguing that a contract is invalid *ab initio* because

of a remote possibility that one of the parties might not meet its obligations in the

future.

It is important to note that, if L'Enfant fails to fulfill its charitable purpose,

the Commissioner can revoke L'Enfant's tax-exempt status and the District of

Columbia can revoke its charter.  But a remote *possibility*—howsoever slight—that

L'Enfant *might* abuse its discretion or otherwise act inconsistent with its mission

---

[9]    The Commissioner does not challenge that L'Enfant is "a qualified organization" under IRC § 170(h)(1)(B).  (Brief of Appellant at 38-39.)  Nor could this be challenged.  As L'Enfant's president explained at trial, the IRS previously audited L'Enfant in 2007 (for the Trust's 2003 tax year) and confirmed L'Enfant's status as an organization exempt from federal income tax under IRC § 501(c)(3).  (Doc. 36 at 12-13.)

- 9 -

cannot invalidate an otherwise deductible donation. *See* 26 C.F.R. §§ 1.170A-1(e), 1.170A-14(g)(3). Such a standard would invalidate the tax deduction for practically *any* charitable contribution to *any* charitable organization.

The Commissioner also asserts that no deduction is allowed because the easements duplicate requirements imposed by the District of Columbia's Historic Landmark and Historic District Protection Act of 1978, and the regulations promulgated thereunder. (Brief of Appellant at 59.) However, the Commissioner does not dispute that the properties at issue are "certified historic structure[s]" under IRC § 170(h)(4)(A)(iv) that are "[l]ocated in a registered historic district," 26 C.F.R. § 1.170A-14(d)(5)(iii). (Brief of Appellant at 39.) In a number of jurisdictions, including the District of Columbia, *all* "registered historic districts" as defined under IRC § 170(h) are also subject to local historic preservation regulations. Assuming the Commissioner's argument is right, within those jurisdictions, *no* preservation easement on a property located in a registered historic district could qualify for a deduction. The notion that Congress would expressly authorize an unusable deduction is illogical.

The Commissioner's argument also ignores the fact that there *are* significant differences between the District of Columbia's regulatory scheme and the restrictions included in L'Enfant's easement program, both in the scope of what each protects and in the efforts and resources each devotes to enforcing such

protections.  The Commissioner's argument also overlooks that Ms. Simmons and future owners must obtain L'Enfant's consent, which it may withhold in its sole discretion, to make any changes to the appearance of the eased properties—thereby facing a burden—even if those changes are allowable under District of Columbia law.  On this point, the Tax Court correctly found that the easements diminished the value of both properties.

# ARGUMENT

## I. The Tax Court Correctly Found That The Easements Were "Exclusively For Conservation Purposes."

### A. L'Enfant's Retention of a Right To Approve Changes Cannot Defeat The Deductions.

The Commissioner argues that the easements in this case[10] do not satisfy the requirements of IRC § 170(h)(4) and (5)(A) because L'Enfant may consent to "any type of façade change, irrespective of its compatibility with historical preservation."[11] (Brief of Appellant at 41.) A core part of the argument is that those easements do not satisfy the perpetuity requirement of 26 C.F.R. § 1.170A-14(g)(1), purportedly because they do not contain restrictions "that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation." (*Id.* at 40.) The easement deeds demonstrate otherwise. Each deed makes clear that L'Enfant is "chartered to promote a public aesthetic in land use

---

[10]    On November 18, 2003, L'Enfant and Appellee Dorothy Jean Simmons entered into a "Conservation Easement Deed of Gift" relating her property at 17 Logan Circle. (Ex. 7; A. __.) On January 26, 2004, L'Enfant and Ms. Simmons entered into a "Conservation Easement Deed of Gift" relating her property at 1503 Vermont Avenue. (Ex. 8; A. __.) The two deeds are identical in pertinent part.

[11]    The Commissioner would require Ms. Simmons to prove under IRC § 170(h)(4) that each deed includes an express "prohibition on changes 'inconsistent with the historical character of such exterior.'" (Brief of Appellant at 19, 29, 40, 42 n.10, 72.) But Congress did not add that requirement to IRC § 170(h)(4) until 2006, as part of the reforms to contributions of conservation easements after Ms. Simmons' donations in 2003 and 2004. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, § 1213(a)(1), 120 Stat. 780. Indeed, as part of the Pension Protection Act, Congress created additional requirements that donors must meet to claim a tax deduction for donating a conservation easement. In doing so, Congress *reaffirmed* the policy of creating incentives for contributions of conservation easements.

planning, including the preservation of historically important properties," and is "authorized to accept and administer gifts of real and personal property, including easements for conservation purposes, in furtherance of its public purposes." (Ex. 7 at 1; A. __; Ex. 8 at 1; A. __.) Each deed specifies that it is granted "in perpetuity"[12] and recorded in D.C. public land records, and gives L'Enfant authority to inspect the property and to institute proceedings to enjoin violations and have the façade restored to its prior condition. (Ex. 7 at 1, 3; A. __; Ex. 8 at 1, 3; A. __.) And each deed establishes the purpose of the easement:

> [Ms. Simmons] desires to grant to [L'Enfant], and [L'Enfant] desires to accept a scenic, open space and architectural façade easement on the Property, *exclusively for conservation purposes*.
>
> * * *
>
> It is the intent of the parties that the Façade, Building and Property (except for minor changes in the landscaping) *remain essentially unchanged*, and in the case of ambiguity, the photographs and descriptions constituting Exhibit B shall control.

---

[12]  The Commissioner's position on the term "perpetuity" is internally inconsistent. On the one hand, the Commissioner does not dispute that each of Ms. Simmons' donations constitutes "a qualified real property interest" under IRC § 170(h)(1)(A). (Brief of Appellant at 38-39.) The Commissioner thus concedes, by virtue of the definition of that term in the IRC, that each interest Ms. Simmons donated is "a restriction (*granted in perpetuity*) on the use which may be made of the real property." IRC § 170(h)(2)(C) (emphasis added). On the other hand, the Commissioner disputes that each of Ms. Simmons' donations were granted "in perpetuity" for purposes of IRC § 170(h)(5). There is no reason to believe that Congress intended the term "perpetuity" to have a different meaning in IRC § 170(h)(2)(C) and IRC § 170(h)(5).

- 13 -

(Ex. 7 at 1; A. __; Ex. 8 at 1; A. __ (emphasis added).)  Further, as the Tax Court correctly noted, the deeds require that any rehabilitative work or new construction on the properties must comply with "appropriate local, state, or Federal standards for construction or rehabilitation."[13]  These provisions do not allow changes that are inconsistent with conservation purposes.

More fundamentally, the right to allow or forbid change is a tool L'Enfant needs to fulfill its job of assuring that historic preservation can co-exist with changing times.  The Commissioner here does not dispute that "The L'Enfant Trust was 'a qualified organization'" and exempt from federal income tax under IRC § 501(c)(3).  (Brief of Appellant at 39.)  Under the Treasury regulations, this means that, at the time of the donation, L'Enfant had "a commitment to protect the conservation purposes of the donation" and the "resources to enforce the restrictions."  26 C.F.R. § 1.170A-14(c)(1).

If L'Enfant fails to fulfill its charitable purpose, the Commissioner has the power to revoke L'Enfant's tax exempt status.  *See* IRC § 501(c)(3); 26 C.F.R § 1.501(c)(3)-1(c)(1) (an organization will not be regarded as operating exclusively

---

[13]    This provision of the deeds adopts 26 C.F.R. § 1.170A-14(d)(5)(i), which allows rehabilitative work or new construction to an historic building—*i.e.*, a "future development"—without defeating the tax deduction, as long as the change is consistent with "appropriate local, state, or Federal standards for construction or rehabilitation."  This regulation acknowledges the role of historical preservation in *accommodating* change.  An example of the "Federal standards" is the Secretary of the Interior's Standards for Rehabilitating Historic Buildings, codified at 36 C.F.R. Part 67 and referenced in the deeds here.  (Ex. 7 at 2; A. __.; Ex. 8 at 2; A. __.)

for exempt purposes if more than an insubstantial part of its activities does not further an exempt purpose). The District of Columbia also has the power to revoke L'Enfant's articles of incorporation if L'Enfant acts inconsistently with its nonprofit purpose. *See* D.C. Code § 29-301.53(a)(5) (permitting injunctive or equitable relief in action brought by the District of Columbia Attorney General where the "corporation has continued to act contrary to its nonprofit purposes").

In these circumstances, the possibility that L'Enfant could abuse its discretion in exercising the judgment that it requires to control change is too remote to invalidate the deduction. *See* 26 C.F.R. §§ 1.170A-1(e), 1.170A-14(g)(3) (deduction cannot be disallowed "merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible").[14]

---

[14]     It is perhaps for this reason that the Commissioner has not always asserted that a preservation easement giving a charitable organization the sole discretion to approve changes to the appearance of a historic building fails the "perpetuity" requirement. *See, e.g.*, CCH IRS Letter Rulings Reports No. 181, August 21, 1980; I.R.S. P.L.R. 8032013 (Apr. 14, 1980) (Commissioner found that easement giving a nonprofit organization the sole discretion to prevent the donor "from altering the color of the paint on the exterior of the house" was "in gross in perpetuity in the manner and to the extent provided under section 170 of the Code and regulations thereunder"); *Hilborn v. Comm'r*, 85 T.C. 677 (1985) (Commissioner agreed that servitude "qualified as a real property easement in perpetuity for conservation purposes" even though it gave a qualified charitable organization "the sole right at Grantee's own discretion to preserve or maintain in

Footnote continued on next page

**B.    L'Enfant's Retention of a Right To Abandon Cannot Defeat The Deductions.**

The Commissioner asserts that the easements do not satisfy the requirements of IRC § 170(h)(5)(A) and 26 C.F.R. § 1.170A-14(g)(1) because L'Enfant retains the right to "abandon" those easements or its enforcement rights.  As with the right to change the appearance of the façade, however, L'Enfant's § 501(c)(3) status and charter give L'Enfant the needed flexibility to control change but constrain L'Enfant's ability to abandon the easements in a manner contrary to conservation purposes.  Indeed, L'Enfant risks losing its tax-exempt status if the Commissioner finds that the Trust is not carrying out its charitable purposes because it is mismanaging the easements entrusted to it.

In addition, regardless of whether it is expressly stated in the easement deed, the right to abandon an easement is a right that all conservation easements holders in the District of Columbia have by virtue of local law.  *See* D.C. Code § 42-202(a)(1) ("a conservation easement may be created, conveyed, recorded, assigned, *released*, modified, *terminated*, or otherwise altered or affected in the same manner as other easements . . .") (emphasis added).  Affording a conservation easement-holding organization the right to abandon an easement also is sound policy, if the

Footnote continued from previous page
its present condition . . . the appearance, composition and/or character of the said exterior façade, front or roof of the above described property and the buildings and improvements located thereon").

- 16 -

circumstances of the abandonment would result in a significantly greater public benefit. For example, the organization might decide to enter an agreement with a developer that releases a single easement (*e.g.*, on a single, modest building next to a Metro stop) in exchange for easements on significant additional properties (*e.g.*, an entire block of nearby buildings). The right to say yes or no in such a circumstance—a right codified in D.C. law—allows a responsible easement-holding organization to fulfill its mission and to ensure that historic preservation can co-exist with changing times.

In any event, the deeds at issue here merely restate local law, making it clearer for donors and donees alike. L'Enfant's ability to abandon its rights under the easements in this case thus would exist even if the deeds were silent on that issue. Accepting the Commissioner's argument that an expressly-stated right of an easement-holding organization to abandon its rights renders the easement non-perpetual as a matter of law would mean that no preservation easement granted in the District of Columbia could be tax deductible under federal law, unless the easement-holding organization were to waive those rights expressly conferred to conservation easement holders by local law. Such a result would make no sense.

The Commissioner's position also is inconsistent with *Stoler v. Comm'r*, 53 T.C.M. (CCH) 973 (1987). There, the taxpayers granted to a municipal government a scenic easement over undeveloped land. Then as now, the Code

- 17 -

required that an "easement with respect to real property must be granted in perpetuity in order to qualify for a charitable contribution deduction." *Id.* at 978. The Commissioner contended that the easement was not "granted in perpetuity," among other things, because a possibility existed that the easement could be abandoned by the grantee. *Id.* at 980.

The taxpayers in *Stotler* relied on 26 C.F.R. § 1.170A-1(e), which provides that if a vested interest passing to charity "would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appears on the date of the gift to be so remote as to be negligible, the [charitable] deduction is allowable." *Id.* at 979. In ruling for the taxpayers, the court found that the future events posited by the Commissioner— such as the possibility that the municipality could find that no public purpose would be served by keeping the land as open space—were "so remote as to be negligible." *Id.* at 980.

Similar logic applies here. Nothing in the record suggests that the possibility that L'Enfant might abandon easements in a manner inconsistent with conservation purposes is more than remote. The president of L'Enfant testified in this case that "it might make sense" for L'Enfant to abandon easements "if an area was ruined" by a terrorist strike in the District of Columbia. (Doc. 36 at 34-35; A. __.) However, the Commissioner can point to nothing to suggest more than a remote

chance of that occurring, or of L'Enfant acting inconsistent with the conservation purposes of the easements.

### C.    The Easements Need Not Detail What Happens If L'Enfant Ceases To Exist or Abandons Its Rights of Enforcement.

The Commissioner faults the easements because "they do not contain any provisions detailing what happens to the easements" if L'Enfant ceases to exist, or should L'Enfant "abandon its rights of enforcement."  (Brief of Appellant at 42.) Each deed makes clear that "[t]his easement shall survive any termination of Grantor's or Grantee's existence."  (Ex. 7 at 3; A. __; Ex. 8 at 3; A. __.)  In the event that L'Enfant dissolved, its assets—including the easements at issue here— would be transferred to another organization engaged in "activities substantially similar to those of" L'Enfant.  *See* D.C. Code. §§ 29-301.48 (voluntary dissolution); 29-301.56 (involuntary dissolution).  The Commissioner does not dispute this point.  The Commissioner also agrees that L'Enfant satisfies the organizational test under 26 C.F.R. § 1.501(c)(3)-1(c).  Indeed, it is clear that upon dissolution of L'Enfant or the abandonment by L'Enfant of its assets, those assets (or the proceeds from the sale of such assets), will be distributed for one or more exempt purposes.  In other words, the easements' conservation purposes would *continue* to be protected in perpetuity if L'Enfant ceased to exist.

In addition, the Commissioner concedes that, at the time of the donation, L'Enfant was a tax-exempt organization, IRC § 503(c)(3), such that it had "a commitment to protect the conservation purposes of the donation" and the "resource to enforce the restrictions." IRC § 170(b)(1)(A)(vi); 26 C.F.R. § 1.170A-14(c)(1); S. Rep. No. 96-1007, 96th Cong., 2d Sess. 14 (1980) (expressing congressional intent that contributions must be made to organizations which have the commitment and resources to enforce perpetual restrictions). At the time of the donation, the possibility that L'Enfant would cease to exist or abandon its rights of enforcement was no more than a remote possibility. *See* 26 C.F.R. § 1.170A-14(g)(3). Finally, and in all events, by this argument the Commissioner is attempting to impose a new requirement for easement-holding organizations that is not currently required in the applicable Treasury regulations.

### D.     The Mortgagees Subordinated Their Interests To The Rights of L'Enfant.

The Commissioner complains that the "[a]cknowledgement" form executed by each mortgagee "do[es] not expressly state that the mortgagee recognizes that its interest is subordinated to the rights" of L'Enfant. (Brief of Appellant at 43.) Page 4 of each deed makes clear that each mortgagee subordinated its interests to L'Enfant:

> The property is currently encumbered by Deeds of Trust
> recorded in the land records of the District of Columbia

- 20 -

> securing loans payable to National City Mortgage and
> Countrywide Home Loans ("Lenders"). Lenders hereby
> subordinates [sic] their rights in the Property to the right
> of the Grantee, its successors or assigns, to enforce the
> conservation purposes of this easement in perpetuity, and
> *join in the execution of this Conservation Deed for the
> sole and limited purpose of so subordinating their
> interests.*

(Ex. 7 at 4; A. __; Ex. 8 at 4; A. __.) Page 5 of each deed is an executed form

entitled "Lender Acknowledgment—Conservation Easement," which reflects that

each mortgagee signed a statement that "acknowledge[d] and deliver[d] these

presents as its act and deed." (Ex. 7 at 5-6; A. __; Ex. 8 at 5-6; A. __.)

According to the Commissioner, because the mortgagees' signatures appear

on this "acknowledgement" form, "there is at least a possibility of future litigation

that could test [the] proposition" that "the lenders had agreed to subordinate their

interests." (Brief of Appellant at 43.) However, there is no requirement in the law

or applicable Treasury regulations that the signature page of a subordination

agreement must expressly state that the signer agrees to be bound to requirements

found on preceding pages of the agreement. The Tax Court properly found that the

deeds satisfied the subordination requirements of 26 C.F.R. § 1.170A-14(g)(2).

## II.     The Tax Court Correctly Concluded That The Easements Caused A Diminution of Value For Both Properties.

The Commissioner argues that the Tax Court erred in finding a common 5%

diminution of value for both properties based on the easements granted to

- 21 -

L'Enfant.  (Brief of Appellant at 59.)  According to the Commissioner, the easements were superfluous and did not prevent anything not already covered by District of Columbia preservation laws.  (*Id.*)  The Commissioner thus repeats the arguments of its expert below, who did not find any change in the fair market value of either property as a result of the granting of the easements.  (Doc. 41 at 21; A. __.)

The Tax Court appropriately rejected these arguments.  Easement donations may or may not have been overvalued in the past, and, in some circumstances, they may sometimes have involved only small reductions in market value.  However, it is hard to imagine that a property free and clear of an encumbrance is not worth *something* more than an identical property encumbered by an easement, as others have found.  *See, e.g.*, *Whitehouse Hotel Ltd. Partnership v. Comm'r*, 615 F.3d 321, 327 (5th Cir. 2010) (noting that it was "rather extraordinar[y]" that the Commissioner's expert assigned a preservation easement a value of zero); *Evans v. Comm'r*, T.C.M. (RIA) 2010-207, 1277 (2010) ("We note that ordinarily any encumbrance on real property, howsoever slight, would tend to have some negative effect on the property's fair market value.  Even a nominal encumbrance that is placed by the current owner of the property would, at the very least, deprive a

subsequent owner of the opportunity of placing a similar encumbrance on that property.").[15]

The Commissioner relies on a footnote in *Herman v. Comm'r*, 98 T.C.M. (CCH) 197, 203 n.5 (2009), stating that "it is difficult to justify a charitable contribution deduction for an owner's agreement to refrain from doing what he is already legally forbidden to do." (Brief of Appellant at 60.) But there, the Tax Court was responding to the taxpayer's argument that the easement effectively authorized the easement-holding organization to enforce the local preservation law. *Herman*, 98 T.C.M. at 203 n.5. Here, by contrast, the easements required the donor to do significantly *more* than whatever the District of Columbia restrictions imposed: to obtain L'Enfant's consent to make changes to the façades, even if those changes are allowable under the District of Columbia's preservation law. Moreover, under District of Columbia law, the donor must obtain the L'Enfant's written consent *before* the HPO can issue a permit allowing changes to the facades. *See* D.C. Code § 42-202.01.

---

[15]    *See also Schwab v. Comm'r*, 67 T.C.M. (CCH) 3004, 3005-7 (1994) ("We find it hard to imagine a prospective purchaser of a [tract of] land who would not have considered the restrictions of the open-space easement in determining the price."), *cited with approval in Hughes v. Comm'r*, T.C.M. (RIA) 2009-094, 712 (2009) ("[W]e disagree with [Commissioner's expert's] conclusion that the conservation easement may have had no, or only a nominal, impact on the fair market values of the [encumbered land].").

The Tax Court here properly relied on this "additional level of approval before any changes could be made to the properties." (Doc. 41 at 26; A. ___.) Other decisions of the Tax Court similarly have found a significant economic diminution in value caused by the donation of a preservation easement, even where the restrictions imposed by the easement and a local landmark law significantly overlapped. *See, e.g.*, *Griffin v. Comm'r*, 56 T.C.M. (CCH) 1560 (1989); *Nicoladis v. Comm'r*, 55 T.C.M. (CCH) 624 (1988); *Hilborn v. Comm'r*, 85 T.C. 677 (1985).

The Commissioner nonetheless asserts that "if taxpayer conveyed to L'Enfant nothing more than a promise not to do what she was already prohibited from doing by local law, it is difficult to understand how what she donated had any value at all." (Brief of Appellant at 45.) But—as noted above—the premise of this assertion is incorrect: the restrictions of the easement are not identical to the restrictions under the local preservation law. Moreover, taken to its logical conclusion, the Commissioner's argument would deprive a tax deduction for *any* donor of an easement on a property located in a registered historical district in a jurisdiction such as the District of Columbia, where local law also regulates registered historic districts. Indeed, there is no dispute here that the properties at issue are "certified historic structures" under IRC § 170(h)(4)(A)(iv), in part because they are located in a registered historic district. (Brief of Appellant at 39.)

In the District of Columbia, all such districts are regulated by a local preservation law. *See* D.C. Code § 6-1101 *et seq.* Thus, under the Commissioner's argument, no easement donated on property located in a registered historic district in the District of Columbia could have value recognizable under IRC § 170(h). That type of sweeping invalidation of tax benefits for easement donations would disregard the congressional purpose underlying IRC § 170(h).

In any case, the record establishes that each deed's restrictions *are* more onerous than those provided for by the District of Columbia's preservation laws. At trial, the president of L'Enfant explained that L'Enfant must approve changes to paint colors, whereas the HPO does not impose the same requirement. (Doc. 36 at 39-41; A. __.) There is no evidence in the record refuting that point.[16] The president of L'Enfant further testified that, when mortar erodes on an eased property, L'Enfant requires "retucking" (or scraping out eroded mortar and putting new mortar in). However, the District of Columbia often allows a homeowner to simply patch and paint the masonry as problems develop, a less expensive process. (Doc. 36 at 39-41; A. __.) L'Enfant's president also described an instance in

---

[16]    Publicly available information published by the HPO confirms that "[p]ainting and caulking" are among items of "[w]ork not requiring a permit and not subject to inspection." District of Columbia, Historic Preservation Office Enforcement Program, *available at* http://planning.dc.gov/planning/frames.asp?doc= /planning/lib/planning/preservation/enforcement/hp_enforcement_priorities.03.09. pdf.

which the District of Columbia issued a permit allowing vinyl replacement

windows prior to review and approval by L'Enfant.  (Doc. 36 at 28-29; A. __.)

Because L'Enfant typically does not permit vinyl windows in historic buildings,

notwithstanding the District of Columbia's permit, L'Enfant required the property

owner to use different replacement widows consistent with historical preservation.

(Doc. 36 at 29; A. __.)  The owner thereafter had to apply for a new permit.  (*Id.*)

  The Commissioner also downplays testimony about L'Enfant's enforcement

activities as "anecdotal," but the record is clear that L'Enfant is more active in

enforcing its restrictions than the District of Columbia.  L'Enfant's president

summarized L'Enfant's enforcement activities as follows:

> The Trust routinely writes all property owners every
> year, so we have written correspondence, and, that way,
> if something gets returned, and we're not made aware of
> a sale, we'll find the owner's name.  So we write all of
> our donors.

> We inspect every property every year.  We photograph
> every property every year.  We plaque all of our
> properties.  We import all of the data into our office data
> bank . . . and . . . the reviewing of city permits, is really
> effective.

> We see both the building permits from the D.C. Historic
> Preservation Office, which they are good enough to send
> us every month, and we also see Commission of Fine
> Arts review in Georgetown for any permits of some of
> our buildings that could be in Georgetown.  So permit
> review generates a lot of work as well.

>You know, we don't scold people as soon as we find
>them on the building permit list because they have a right
>to go forth, but they can't proceed with their project until
>they also have review from us.  So we call them and
>remind them that they are going to need a letter from the
>[T]rust before they go forward.  So that's how that
>works.  Enforcement is pretty active in [T]he L'Enfant
>Trust.

(Doc. 36 at 37-38; A. ___.)

The president of L'Enfant further explained that the District of Columbia previously "signed off" on changes to historic buildings, only to have L'Enfant exercise its "right to intercede" and prevent those changes.  (Doc. 36 at 27-28; A. ___.)  Further, she described an instance where L'Enfant filed suit against a donor who painted her property "strange colors" without L'Enfant's permission, and refused change it back.  (Doc. 36 at 41-42; A. ___.)  L'Enfant hired outside counsel, filed suit, won summary judgment, obtained over $80,000 in attorneys' fees (as authorized by the deeds), and thereafter repainted the house "as it was when the easement was given."  (Doc. 36 at 42; A. ___.)

In contrast to these efforts, the manager of the District of Columbia's historical preservation program testified that, although his office maintains a list of permit applications on which his office signed off, "[o]ur inspectors actually, however, don't have really the time to do routine sweeps of historic districts." (Doc. 36 at 91; A. ___.)  The manager explained that his office has never instituted

- 27 -

criminal proceedings to enforce violations, and cannot recover attorney's fees.

(Doc. 36 at 92; A. __.)  He further testified:

> [W]e prefer not to have the burden of enforcing
> easements.  It's something that we're not really
> administratively set up to do because we don't really
> have the time to go out annually, or however often, to
> affirmatively inspect properties.  As I've testified, our
> enforcement response is really responsive; it's not
> affirmative.

(Doc. 36 at 94; A. __.)

The Commissioner would have the Court brush aside these differences,

pointing to the possibility that the District of Columbia might strengthen its laws,

or enforce them more rigorously, in the future.  According to the Commissioner,

"[t]he issue is not what the parties to the easement currently are doing; the issue is

how the deeds bind L'Enfant and its successors in perpetuity."  (Brief of Appellant

at 61.)  Nevertheless, just as there is a possibility that the District of Columbia

might make its laws stricter, it is equally (if not more) possible that preservation

laws will weaken over time.  Those laws are only as strong as the political will that

keeps them in place, and a new generation might yield to the economic and

development pressures of the day.[17]  Unlike local preservation legislation, the

---

[17]   Recent legislative proposals in nearby jurisdictions would weaken local
preservation laws, including in Montgomery County, Maryland, where one
proposal would require "owner consent" limitations for historic designations.  *See*
Ann E. Marimow, *Standing Their Ground: Montgomery Proposal Divides*

Footnote continued on next page

private property rights embodied in a conservation easement are insulated from such pressures in perpetuity.

Valuation of preservation easements is a complicated and subjective issue. As a result, at least some in the Commissioner's office previously concluded that "the proper valuation" of a preservation easement is approximately 10-15 percent of the property.[18] The IRS's Advisory Council likewise has called upon the Commissioner to "[a]dopt a safe-harbor audit policy that 'qualified appraisals' (original or revised) will be accepted (absent clear and convincing evidence to the contrary) when the appraised value of the donated easement is equal to or less than 10 percent of the value of the underlying property."[19] Regardless of whether a safe harbor is the right result for the future, the IRS's finding that the easements in this case had zero value is wrong.

---

Footnote continued from previous page

*Preservationists, Land Owners*, WASH. POST, June 5, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/06/04/AR2009060404430.html. Indeed, a similar proposal was considered in the District of Columbia following an unsuccessful effort to establish a new historic district in Chevy Chase, D.C. *See* Marc Fisher, *Chevy Chase DC Rejects Historic Status*, WASH. POST, Oct. 20, 2008, *available at* http://voices.washingtonpost.com/rawfisher/2008/10/chevy_chase_dc_rejects_hist ori.html.

[18]   As of the date of the preservation easement contributions in this case, IRS engineers performed a study and concluded that ". . . proper valuation of a façade easement should range from approximately 10% - 15% of the value o the property." Mark Primoli, *Façade Easement Contributions*, p. 2, FEDERAL HISTORIC PRESERVATION TAX INCENTIVES, NATIONAL PARK SERVICE (Sept. 7, 2000).

[19]   IRSAC Report, *supra* note 2.

## CONCLUSION

For the reasons stated above, the Tax Court's decision should be affirmed.


Dated:  November 16, 2010.          Respectfully submitted,

                                    /s/ Matthew A. Eisenstein
                                    Matthew A. Eisenstein
                                    ARNOLD & PORTER LLP
                                    555 Twelfth Street, N.W.
                                    Washington, D.C. 20004-1206
                                    Tel: (202) 942-5000
                                    Fax: (202) 942-5999
                                    Matthew.Eisenstein@aporter.com

## PERTINENT STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), *Amici Curiae* state that the pertinent statutes are contained in the addendum to the Brief for Appellant, subject to the points of clarification stated on page 3 of the Brief for Appellee.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,952 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32.  In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare this brief.

2.  This brief complies with the typeface requirements of D.C. Circuit Rule 32(a)(1) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionately spaced typeface using Microsoft Office Word 2003 in 14 point, Times New Roman.


Dated:  November 16, 2010.
Washington, D.C.

/s/ Matthew A. Eisenstein
Matthew A. Eisenstein
ARNOLD & PORTER LLP
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of November, 2010, the foregoing *Brief of Amici Curiae* National Trust for Historic Preservation, The L'Enfant Trust, and Foundation for the Preservation of Historic Georgetown In Support of Appellee Dorothy Jean Simmons (Supporting Affirmance) was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. Counsel for Appellee and Counsel for Appellant were served electronically via the Notice of Docket Activity transmitted by the CM/ECF system. Five paper copies have been submitted to the Court on the same date via hand delivery.

Executed in Washington, D.C. on November 16, 2010.

/s/ Matthew A. Eisenstein
Matthew A. Eisenstein
ARNOLD & PORTER LLP

- 33 -